106 Cal.Rptr.2d 465 (2001)
88 Cal.App.4th 1126
In re NICHOLAS B., a Person Coming Under the Juvenile Court Law.
Santa Cruz County Human Resources Agency, Plaintiff and Respondent,
v.
Bill B., et al., Defendants and Appellants.
No. H020404.
Court of Appeal, Sixth District.
May 7, 2001.
*467 Janet G. Sherwood, By appointment of the Sixth District Appellate Program, Attorney for Defendant and Appellant Kimberly B.
Kenneth A. Krekorian, By appointment of the Sixth District Appellate Program, Attorney for Defendant and Appellant Bill B.
Dwight Herr, County Counsel, Dana McRae, Assistant County Counsel, Attorney for Plaintiff and Respondent Santa Cruz County Human Resources Agency.
Robert Patterson, Rancho Mirage, Attorney for Minor.
*466 WUNDERLICH, J.
Bill and Kimberly B., the parents of the minor Nicholas B., appeal from the jurisdictional and dispositional orders of the juvenile Court adjudging the minor a dependent child pursuant to Welfare and Institutions Code section 300, subdivision (b),[1] removing the child from their custody and ordering family reunification services. Under subdivision (b) of section 300, it must be proved that there is a substantial risk the child will suffer serious physical harm as a result of his parents' inability to supervise or protect him. The parents contend that the allegations contained in the petition failed to state a basis for jurisdiction *468 under section 300, subdivision (b) and that there was insufficient evidence for the court to assume jurisdiction over the minor. In addition, they challenge the dispositional order and the suspension of visitation. We agree that the allegations in the petition failed to state a basis for jurisdiction under section 300, subdivision (b), in that they do not allege a current substantial risk that the child will suffer serious physical harm as a result of his parents' inability to supervise or protect him. We thus reverse the jurisdictional and dispositional orders.

BACKGROUND
Nicholas B. was born in September 1985. His biological mother (Tiffany) was a friend of Bill B.'s adult son, Bruce. When Nicholas was six years old, Tiffany decided to place him and his younger sister Priscilla for adoption, and at the recommendation of Bruce B., the two children were adopted by Kimberly and Bill B. When Nicholas was in the fifth grade, the B.'s adopted two more girls, and Nicholas later reported feeling that Bill loved the girls more than he loved him.[2]
In 1995, when Nicholas was nine years old, his parents placed him in therapy with Bret Johnson, Ph.D., because of behavioral problems. In 1996-1997, Nicholas was seen by therapist Neil Brown. According to Kimberly, Nicholas had become an angry, oppositional child. He tried to set a fire in a school bathroom; he had disciplinary problems at school; he began stealing things and hoarding food. The parents were taught two techniques for dealing with Nicholas's uncontrollable rages. Future Families, the adoption agency the family worked with, recommended putting Nicholas in a cold shower, fully clothed, until his raging stopped. Therapist Brown showed the parents how to physically restrain Nicholas after he went into a rage at a family counseling session and tried to smash a computer.
In early 1998, Nicholas was referred to the Children's Health Council in Palo Alto for an evaluation, but the parents reported receiving no written results nor any helpful information or tools. Nicholas was diagnosed with a conduct disorder, possible mood disorder, mistrust of adults and feelings of not being cared for. Nicholas then began seeing therapist Jon Girvetz and the parents began working with Future Families' parent support groups.
The triggering incident occurred on September 15, 1998, when Nicholas (then 13 years old) was struck in the face by Kimberly after a dispute over spilled potato chips, sibling squabbles and Nicholas's use of offensive language.[3] The next day, Nicholas's therapist Jon Girvetz saw injuries (bruises and swelling) to Nicholas's face and reported them to the Santa Cruz County Human Resources Agency (Agency). Kimberly admitted to Girvetz and to the Agency that she had slapped Nicholas in the face, but by other accounts, she pinned him to the ground and punched him in the face with her fist.[4] The investigating social worker described the injuries as "very severe." In the course of the investigation, reports were received from Nicholas's sisters that Bill physically abused Nicholas. At first Bill denied these reports, then he called the investigating social *469 worker and admitted he had lied and that he had hit Nicholas in the past.
As a result of the investigation, the family agreed to voluntarily place Nicholas in foster care and to participate in a voluntary reunification plan. By doing so, they hoped to gain clarity and perspective on the problems and to get services to help them meet Nicholas's needs. Although Nicholas seemed to adjust well to his first foster home, there were difficulties with visitation and counseling. The foster family allowed no access to Nicholas for the first six weeks and no visits took place for three months. In October and November 1998 Nicholas did not want to visit his parents and the Agency did not enforce the visits.
The Agency then asked Pauline Fillion, a licensed marriage and family counselor who was experienced in adoption issues, to assess the family and its problems and to develop a plan for reunification. Over the next few months, she had several visits with Nicholas and the family, although she spent a limited amount of time with Nicholas alone. The family informed her that Nicholas had been in numerous (they estimated as many as 17) different placements prior to the age of five. Based in part on this unconfirmed information as well as on her interviews with Nicholas and the family, she made a diagnostic assessment of Nicholas as having reactive attachment and post-traumatic stress disorders. Based on the severe needs of a child with attachment disorder, Fillion recommended intense counseling for both Nicholas and his family, as well as a psychiatric assessment and medication evaluation for Nicholas.[5] She was critical of the initial delay in visitation and counseling, as it "thwarted" reunification prospects at an important time. The diagnosis of attachment disorder made sense to the parents, as it helped to explain Nicholas's behavior.
At Christmas, Nicholas reportedly looked forward to seeing his family and in February 1999, he was making plans to come home and to redecorate his room. The family had nine visits between December and March; the foster family would not allow more. Then after a visit with his adult stepbrother Bruce in March 1999, Nicholas refused to see his family and did not want to return home, but hoped to move in with Bruce.
On March 11, 1999, the Agency, represented by a new social worker, filed a petition pursuant to section 300, subdivision (b) (failure to protect), alleging that after six months of services, the parents were not able to alleviate the concerns which brought Nicholas to the attention of the agency and were not prepared to accept Nicholas back into their home.[6]
On March 19, 1999, a hearing was held on visitation with the parents. The court heard testimony and met with Nicholas alone in chambers, in an unreported conversation. The court then suspended visits between Nicholas and his parents and authorized supervised visits between Nicholas and his stepbrother Bruce, on condition Bruce not discuss the case. The court ordered family therapy to continue. However, Nicholas refused to attend family therapy and the Agency so informed the court on April 2, 1999.
On May 4, 1999, the contested jurisdiction hearing began. After hearing testimony from eight witnesses, the juvenile court found that the Agency had met its burden of proof on three of the four allegations *470 in the petition and found that Nicholas was a child described by section 300, subdivision (b). Witnesses included Kimberly B., Pauline Fillion, Bruce B. (the adult son of Bill) and the current and former social workers. Bruce B. testified that he and his two brothers were estranged from their father because of his intimidating personality. He said his father had a volatile temper and that Nicholas and his sister had told him of mistreatment by Bill. He testified he had seen Bill hit Nicholas two or three times. The current social worker Mae Conroy testified that the parents were receiving support and intervention prior to the voluntary plan and had made little progress during Nicholas's voluntary placement. She noted that the parents minimized the physical abuse and did not take full responsibility nor did they attempt to have Nicholas returned to their home.[7] She also testified that Bill had not attended counseling for anger management and that Nicholas did not want to go home. The Agency report prepared for the hearing stated that Nicholas was doing well in his foster home, although his parents attributed that to a lack of structure in the foster home.
On July 8, 1999, a disposition hearing was held. The report prepared for the hearing recommended continued out-of-home placement with reunification services, and parental visits to resume when the therapist expressed support for such visits. At the hearing, it was noted that Nicholas was in a different foster home as the two or three prior placements had ultimately not worked out because Nicholas's behavior had deteriorated. However, according to the current social worker (Trevor Davis), Nicholas still did not want to visit his parents and had no desire to return home. Dr. Bret Johnson, Nicholas's therapist, testified that he had first seen Nicholas in therapy in 1995 for 15 times and had now seen him 12 times in 1999. He diagnosed him as having an attention deficit hyperactivity disorder, being inattentive, dythmic, and oppositional defiant with conduct disorder. He opined that it would be very detrimental for Nicholas to return to Bill and Kimberly as the bond had been broken. Dr. Johnson reported that Nicholas told him that he did not want to see his parents because of poor communication and his fear of ongoing abuse. Dr. Johnson concluded that "forcing Nick into a situation of communication that he verbalizes he does not want ... [¶] ... would further the problems of trust in the system and his ability to get his needs met."
The juvenile court found by clear and convincing evidence that Nicholas could not be safely returned to Bill and Kimberly and ordered continued foster care placement for the boy with reunification services for the family.

DISCUSSION
The parents first contend that the petition fails to allege facts showing risk to the minor at the time of the hearing and thus the trial court erred in finding the allegations of the petition supported a finding of jurisdiction under section 300, subdivision (b).[8] As in the case of In re Alysha S. (1996) 51 Cal.App.4th 393, 396, 58 Cal. Rptr.2d 494, the Agency here erroneously assumes this is essentially a substantial evidence claim: "[T]his is not a no substantial *471 evidence claim; it is a claim of failure to state a cause of action." (Original italics.)
The parents raise a facial challenge to the petition and thus we apply the rules akin to a demurrer. (In re Alysha S., supra, 51 Cal.App.4th at p. 397, 58 Cal. Rptr.2d 494.) We construe the well-pleaded facts in favor of the petition in order to determine whether the Agency pleaded that the parents failed to supervise or protect the minor within the meaning of section 300, subdivision (b).
The sustained petition alleged: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or legal guardian to supervise or protect the child adequately. [¶] b-1 On or about September 15, 1998, a referral was received that the minor was observed to have a bruise on his face inflicted by his mother. The Agency investigated the referral, sustained the physical abuse allegation, and offered six months of voluntary services, including out of home foster placement with individual and family counseling. [¶] b-2 Six months of reunification services will have been provided by March 15, 1999. The voluntary services have not led to reunification of the minor with his parents. The minor continues to display behavior that his parents do not accept, such as skateboarding while holding on to the back of a car, listening to the musical group, Nirvana, and disruptive school behavior. The therapist that has worked with the family for the [six-month] period states that the minor and parents are not yet ready for reunification. [¶] ... [¶] b-4 On or about March 27, 1998, a Psychological Evaluation was completed by Dr. John Renter, Ph.D. The minor was diagnosed with a Conduct Disorder, Psychosocial and Environmental Stressors: Current family difficulties, and multiple conflicts and changes before adoption." The juvenile court did not sustain allegation b-3: "On or about April 1, 1998, a Psychiatric Medication Evaluation was completed by Dr. Kiki Chang, M.D. The minor was diagnosed with a possible Mood Disorder, mistrust of adults and feelings of not being cared for."
Trial counsel had objected that even if the supporting allegations were found to be true, they would not support the finding required for jurisdiction under subdivision (b) of section 300. This same point is now asserted on appeal.
We begin by noting that the petition must contain "A concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted." (§ 332, subd. (f).) "A cause of action in dependency under [section 300, subdivision (b)] requires proof that `[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent ... to adequately supervise or protect the minor.' Further, `[t]he minor shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the minor from risk of suffering serious physical harm or illness.' (§ 300, subd. (b), italics added.)" (In re Alysha S., supra, 51 Cal.App.4th at p. 397, 58 Cal.Rptr.2d 494.) We also note that the circumstances under which the juvenile court is authorized to take jurisdiction of a child are narrowly defined. (See In re Alexander K. (1993) 14 Cal.App.4th 549, 559, 18 Cal.Rptr.2d 22.)
The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the *472 defined risk of harm. (In re Rocco M. (1991) 1 Cal.App.4th 814, 824, 2 Cal. Rptr.2d 429.) "In determining what constitutes a substantial risk of serious physical harm, some general guidance may be drawn from subdivision (a) of section 300, which uses the same language to authorize jurisdiction where `[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent or guardian.' For purposes of that subdivision, `a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the minor or the minor's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm.' (§ 300, subd. (a).)" (In re Rocco M., supra, 1 Cal.App.4th at p. 823, 2 Cal.Rptr.2d 429.) While evidence of past conduct may be probative of current conditions, "the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; `[t]here must be some reason to believe the acts may continue in the future.' [Citations.]" (Id. at p. 824, 2 Cal.Rptr.2d 429.)
In carefully reviewing the petition, we consider each of the three sustained allegations in the relatively spare petition. Allegation b-1 concerned one triggering incident of physical abuse by the mother. This is an incident the mother admitted and regretted. There are no further allegations nor supporting facts to suggest the serious physical harm inflicted by the mother will occur again.[9] As to the father, even though a great deal of testimony was devoted to the physically intimidating, even abusive personality of the father and his physical acts against the minor, he is not mentioned in any of the petition's factual allegations. Although it is true that a finding against one parent is a finding against both in terms of the child being adjudged a dependent (see In re Alysha S., supra, 51 Cal.App.4th at p. 397, 58 Cal.Rptr.2d 494), the incident of the mother striking the minor was purported to be an isolated one while the father's allegedly inappropriate physicality was ongoing yet was not alleged in the petition. If the incident was not likely to recur, then the petition failed to allege facts to demonstrate present or future risk of physical harm. Section 300, subdivision (a) (current danger) is not alleged.
As to allegation b-2, concerning the parents' objections to the minor's behaviors, the fact of non-reunification after six months of voluntary services, and the therapist's recommendation against reunification, these allegations have a tenuous connection to the failure to protect arising out of past infliction of physical harm. By statute, voluntary services leave physical custody rights and placement decisions legally with the parents (§§ 16507.4, 16507.6), yet here, the Agency's contract with the parents required them not to interfere with or object to the out-of-home placement. Further, the social worker cited as a reason the family did not reunify that the parents did not specifically ask that the child be returned home, when the parents testified that they believed they were not allowed to make such a request. In addition, the voluntary plan called for individual and family counseling and visits, but when the minor objected to visits and family counseling, the foster family and the Agency did not require him to attend, thus leaving the parents with no way to fulfill the conditions of the voluntary plan. As to the parents' objections to the minor's *473 behaviors, none of these seem beyond the realm of what many parents of young teenagers would find objectionable.[10]
Allegation b-4 concerned a prior psychological evaluation of the minor, including his diagnosis. The psychological evaluation of the minor was done before official county involvement with the family and was arranged by the parents to assess the minor's troubling behavior. It is curious that the minor's psychological diagnosis was alleged in the petition, but no charge of emotional abuse under section 300, subdivision (c) was alleged.
Perhaps most important, the link of causality is missing.[11] None of the factual allegations focus on the parents' conduct as the cause of the minor's serious emotional problems. In fact the juvenile court commented: "... a lot of it is going to depend upon Nick in terms of whether he's gone so far down the road on the issues of trust and the oppositional defiant that we're not going to be able to get him back, and this may have nothing to do with the adoptive parents [mother and father here]. It may have been this is the child that you got."
In the case of In re Alexander K., supra, 14 Cal.App.4th 549, 18 Cal.Rptr.2d 22, the trial court found the allegation of sexual abuse by the father not true, but sustained jurisdiction on the basis of section 300, subdivision (c), that the child suffered emotional abuse caused by the father. The reviewing court found the evidence insufficient to sustain jurisdiction, in that the factual allegations focused on the child's behavior, not the parent's conduct. In this case, the child did not want to see his father, and the court criticized the unstated presumption of the trial court that emotional disturbance in the child was attributable to the fault of the parent. Here, we also have a child who does not want to see his parents and a trial court that ultimately holds the parents responsible without a supporting allegation in the petition.
The Agency response is that the minor sustained a serious injury and sufficient evidence supported the petition. But as the court emphasized in the case of In re Alysha S., supra, 51 Cal.App.4th 393, 58 Cal.Rptr.2d 494, if the allegations cannot support jurisdiction, it is not a no substantial evidence claim. "[A] facially sufficient petition is necessary." (Id. at p. 399, 58 Cal.Rptr.2d 494, original italics.) Alysha S. also concerned a facial challenge to the allegations in support of a petition filed pursuant to section 300, subdivision (b), wherein the father contended that the allegations sustained at the jurisdiction hearing did not support the finding of jurisdiction. The reviewing court agreed, finding the allegations inadequate. The court explained that the only support for the allegation of failure to supervise was the allegation that the father was incarcerated, *474 but the petition also alleged that the father was now living with the mother. As to the allegations of failure to protect, the petition alleged physical violence by the father against the mother in the past, but there were no allegations that the violence was perceived by or affected the child. The petition also alleged that one year before the father committed lewd acts in touching the child's buttocks and vagina, but there were no further allegations of physical injury or the possibility of the acts continuing in the future. The court concluded: "As we have said before in another context, a pleading is not merely `a ticket to the courtroom which may be discarded after admission.' [Citation.] We have also previously noted that the special nature of juvenile court proceedings means that not all rules applicable to civil cases necessarily apply to juvenile cases. [Citation.] But a facially sufficient petition is necessary. This does not require the pleader to regurgitate the contents of the social worker's report into a petition, it merely requires the pleading of essential facts establishing at least one ground of juvenile court jurisdiction." (In re Alysha S., supra, 51 Cal.App.4th at pp. 399-00, 58 Cal.Rptr.2d 494, original italics.) We conclude that in the case before us, the petition failed to allege essential facts establishing juvenile court jurisdiction under section 300, subdivision (b).[12]
Moreover, "[s]ubdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a substantial risk of serious physical harm or illness." (In re Rocco M., supra, 1 Cal.App.4th at p. 823, 2 Cal.Rptr.2d 429, original italics.) In this case we conclude the allegations in the petition are not sufficient to support jurisdiction. As this court earlier wrote in the case of In re Amy M. (1991) 232 Cal.App.3d 849, 868, 283 Cal.Rptr. 788, "We do not take lightly our decision to reverse this finding.... While we deeply regret the necessity of sending this case back for a new jurisdictional finding almost two years after a finding was made on the original petition, we conclude this course is necessary...."[13]
In light of our determination that the jurisdictional order must be reversed, the dispositional and all subsequent orders, including the visitation order, are moot. However, we find it necessary to briefly discuss the visitation issue due to the importance to the family and for the guidance of the parties.
On March 19, 1999, soon after the petition was filed, the juvenile court ordered visits with the parents suspended and, over the parents' objections, ordered visits for the minor with Bruce, his adult stepbrother. Then in July 1999, in ordering reunification services, the court ordered that "visitation ... shall not occur until the minor's therapist expresses support for such visitation. At [the] point where therapist[ ] consents to visitation, visits are to occur a minimum of one hour per month, supervised at the social worker's discretion." We agree with the parents' *475 assertion that this order gives too much discretion to the therapist and fails to mandate visitation as a necessary part of family reunification.
Whenever a child is removed from parental custody, the juvenile court is statutorily required to provide reasonable reunification services (unless and until a statutory exception is determined to apply), and a normal part of reunification services is visitation between the parents and the child. (§§ 361.5, subds. (a), (c), 319, 362.1, subd. (a)(1).) In fact, section 362.1, subdivision (a)(1) requires that "any order placing a child in foster care, and ordering reunification services, shall provide ... [¶] ... for visitation between the parent ... and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child." (See Cal. Rules of Court, rule 1456(f)(3).)
"Absent a showing of detriment caused by visitation, ordinarily it is improper to suspend or halt visits even after the end of the reunification period. [Citations.] Visitation may be seen as an element critical to promotion of the parents' interest in the care and management of their children, even if actual physical custody is not the outcome. [Citation.]" (In re Luke L. (1996) 44 Cal.App.4th 670, 679, 52 Cal.Rptr.2d 53.) Here, visitation (in conjunction with family therapy) was critical to any possibility of family reunification. Yet the juvenile court order did nothing to promote visitation or to require the minor's participation in family therapy.
A juvenile court may not improperly delegate decisions over visitation to a child's therapist. (In re Donnovan J. (1997) 58 Cal.App.4th 1474, 1476, 68 Cal. Rptr.2d 714.) In finding the order in Donnovan an improper delegation of judicial power, the court explained: "[The order] neither requires that the therapists manage visitation ordered by the court, nor sets criteria (such as satisfactory progress) to inform the therapists when visitation is appropriate. Instead it conditions visitation on the children's therapists' sole discretion. Under this order, the therapists, not the court, have unlimited discretion to decide whether visitation is appropriate. That is an improper delegation of judicial power." (Id. at pp. 1477-1478, 68 Cal. Rptr.2d 714; cf. In re Chantal S. (1996) 13 Cal.4th 196, 213, 51 Cal.Rptr.2d 866, 913 P.2d 1075, where Supreme Court approved an order requiring that visitation for the father be facilitated by the minors' therapist when satisfactory progress had been made by father.)
Similarly, visitation may not be dictated solely by the child involved although the child's desires may be a dominant factor. In the case of In re Julie M. (1999) 69 Cal.App.4th 41, 81 Cal. Rptr.2d 354, the Fourth Appellate District reversed the order requiring consent by the children for visitation. The court pointed to the importance of visits to family reunification, with the danger of children's fears and anxieties increasing the longer there was no contact with the mother. "[T]he ultimate supervision and control over this discretion must remain with the court, not social workers and therapists, and certainly not with the children. [Citations.]" (Id. at p. 51, 81 Cal.Rptr.2d 354.)
It is hard to imagine how the problems faced by this family could be resolved without ongoing family therapy and visitation. To provide the minor and/or his therapist with a veto power over this essential reunification service seems to us to undermine any hope of actual reunification. (See In re David D. (1994) 28 Cal. App.4th 941, 33 Cal.Rptr.2d 861 [reviewing court reversed judgment terminating mother's parental rights, after concluding that suspension of visitation was unwarranted *476 and demonstrated inadequate reunification services].)

DISPOSITION
The order finding jurisdiction over the minor is reversed. The dispositional and visitation orders are thus moot.
PREMO, Acting P.J., and BAMATTRE-MANOUKIAN, J., concur.
NOTES
[1] All further statutory references are to the Welfare and Institutions Code.
[2] Apparently all three girls were special needs children.
[3] Kimberly had come home from work sick when the children began fighting; potato chips were spilled and when she demanded Nicholas clean up the mess, he refused and used offensive language.
[4] Nicholas told the school and later told Pauline Fillion that his facial bruises actually came from a skateboard accident.
[5] When Nicholas experienced increasing difficulties in his foster home and at school, Fillion considered residential placement.
[6] The parents were investigating a residential placement for Nicholas.
[7] Another social worker testified that the parents never verbally expressed to her that they missed Nicholas.
[8] On appeal, each parent is represented by separate counsel and each has filed a separate brief although most issues raised are the same.

The minor has joined the Agency's brief.
[9] In fact, no testimony painted the mother as physically abusive.
[10] These behaviors included skateboarding while holding on to the back of a car, listening to the musical group Nirvana, and disruptive school behavior.
[11] Causality is explained in the case of In re Alexander K., supra, 14 Cal.App.4th at p. 557, 18 Cal.Rptr.2d 22, in the context of section 300, subdivision (c), which "sanctions intervention by the dependency system in two situations: (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment. [¶] In a situation involving parental `fault,' the petitioner must prove three things: (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior."
[12] At oral argument, counsel for the Agency admitted that the petition was not drafted by a lawyer, but by a social worker. We are concerned that the drafting of a legal pleading by a non-lawyer, no matter how accomplished as a social worker, runs the risk of the pleading falling short of requisite legal standards.
[13] Given the lengthy time frame involved in the normal appeal of jurisdictional and dispositional orders, we question the efficacy of our review and the adequacy of any remedy until the Legislature provides for expedited review of jurisdictional and dispositional orders in these extremely important dependency cases.