*1346 Opinion
SUZUKAWA, J.
Craig C. (Father), Elsie C. (Mother), and Christopher C. (Chris)[1] appeal from the juvenile court’s visitation order. They contend the manner in which the order was crafted denies them visitation with the four youngest children and allege the juvenile court improperly delegated its power to order visitation. We conclude that Chris’s appeal must be dismissed. Finding no error in the court’s order, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
This is the third appeal involving the family. Father and Mother have seven children: Chris (bom 1994), twins William and Kyle (bom 1999), and quadruplets Brittany, Heidi, Collette, and Wesley (bom 2001). The family has been the subject of 30 referrals to the Los Angeles County Department of Children and Family Services (DCFS). In order to place the juvenile court’s visitation order in proper context, it will be necessary to set forth the history of this case in some detail.
In October 2008, some of the children alleged that Father sexually abused them and claimed other siblings engaged in substantial sexual conduct with each other. William and Collette accused Father of having sexual contact with Chris in their presence. Other children said that Mother physically abused them and coached them to tell lies against Father. What followed was an ongoing feud, fueled by Father and Mother’s domestic discord. The children hurled accusations at their parents and each other. In time, it became extremely difficult to ascertain fact from fantasy.
In January 2009, DCFS filed a petition alleging sexual abuse by Father and physical abuse by Mother. At the March 2009 contested jurisdictional hearing, the court heard testimony from Chris, William, and Kyle. The court recessed the hearing, stating that the quadruplets would testify the next day. The following day, the court and counsel had a meeting in chambers. The petition was amended and the court found that the severe family conflict placed the children at risk of serious physical and emotional harm. Chris was allowed to remain in Father’s home and the other children were placed in the care of DCFS. The children were to be provided with counseling by a licensed therapist and visitation was to be monitored in a neutral therapeutic *1347 setting. Father appealed from the jurisdictional and dispositional orders, which we affirmed. (In re Christopher C. (2010) 182 Cal.App.4th 73 [105 Cal.Rptr.3d 645].)[2]
In June 2009, Mother filed a Welfare and Institutions Code section 388[3] petition requesting that conjoint counseling with the quadruplets begin immediately and that she be allowed unmonitored visitation. A July 1 hearing on her visitation request was set.
The July 1 interim report continued to chronicle what has been clear from the outset of this case. Mother, who favors the twins, has had issues with the quadruplets and their relationship continues to deteriorate. In March 2009, after hearing Mother talk “incessantly” about the twins, a social worker asked about Mother’s relationship with the quadruplets. Mother said, “Oh, Wesley he can go back with the father, he does not have to come here. He will try to ruin my life.” She claimed that Wesley hated her. In the same conversation, Mother asked the social worker’s opinion about whether the quadruplets’ foster mother would be interested in becoming their legal guardian. Not surprisingly, the ill will has been mutual. The social worker who visited the quadruplets at their foster home reported that “the children have stated repeatedly how they do not wish to visit with their mother giving reasons that range from her being ‘evil’ to ‘our mother hates us and says mean things to us when no one is looking.’ ” The children frequently contacted the social worker and pleaded with her not to force them to visit Mother. The social worker explained to them that the visits were court ordered. The children reluctantly continued to go to the visits; however, the foster mother reported that at times they were taken “kicking and screaming.”
Father also had his issues. Several visits with the quadruplets and Chris had to be discontinued because Father would scream uncontrollably at the children. On one occasion when the monitor tried to tell Father that his behavior was inappropriate, he screamed at her, “I have a Ph.D damnit! You need to show me some kind of respect!”
At the July 1 hearing, the court kept all prior orders in full force and effect. The matter was continued to September 24, 2009. A similar order was issued on July 6.
*1348 In an August 2009 report, children’s social worker Loretta Federico wrote that she met with the quadruplets in their foster home on August 13. Each child stated separately that he or she did not want to visit with Mother. Federico explained that because of the court’s order they did not have a choice in the matter.
Federico reported that at the August 15 visit scheduled at the foster family agency, Mother sat outside and refused to come in because the foster mother was present with the quadruplets. At Federico’s instruction, the agency worker told Mother that he would wait 15 minutes for Mother to join the children, after which the visit would be terminated. Mother left without visiting.
On August 22, at another scheduled visit with the quadruplets, Mother arrived 15 minutes late. She asked the children if they wanted to “visit” with her “or not” because if they did not, she could go to work. Given the choice, the children decided not to complete the visit.[4]
Federico attended the August 29 visit. When Federico arrived, she noticed, once again, that Mother was waiting outside the agency in the car. It was apparent to Federico that Mother was not going to come in as long as the foster mother was present, so Federico asked the foster mother to leave. During the ensuing visit, the quadruplets began confronting Mother, “frequently all talking, shouting or crying at the same time.” Although it was difficult, Federico attempted to document all of the children’s comments. She wrote down almost 40 statements. The quadruplets accused Mother of hitting them with various objects, lying in court and about Father, encouraging them to tell lies about Father, preferring the twins, allowing the twins to abuse them, and telling a former babysitter to hit them. Federico reported that just prior to the visit, Chris, who had completed a visit with her siblings and Father, said that the quadruplets were telling the truth about what home life with Mother was like.
Federico informed the court that another social worker had sent letters to several agencies requesting therapeutic counseling services for Mother and the quadruplets. Only one had responded positively. That agency was 27 *1349 miles away from the children’s foster home and Federico believed a long commute would be detrimental to the children, as they were behind in their school work and were currently receiving special education services.
On September 10, 2009, Mother filed two section 388 petitions. One concerned the quadruplets. Mother requested that the court move them to a different foster home, grant her unmonitored visitation, and order the immediate start of conjoint counseling. Mother alleged that her “progress is threatened because the current foster home placement for [the quadruplets] has been interfering with mother’s visitation with [them], and [the foster mother] has been coaching the quadruplets against their mother. The placement has [led to] unfounded accusations against the mother.” Mother accused the foster mother of making false claims against her and asserted that she was the reason Mother had missed 18 visits with the quadruplets. The petition was summarily denied on September 18.
The September 24, 2009 status review report included several letters written by the quadruplets addressed to various individuals and the court. Each expressed a desire not to visit with Mother and accused her of abuse. In the report, another social worker, Tinita Dorsey, observed “that the family continues to act as a dysfunctional unit in that the parents continue to favor not all, but only particular children, ones they wish to reunify with.” Dorsey informed the court that Father said he would first like to have the quadruplets return to his care because they “are not as messed up as the twins.” Father claimed Mother “brainwashed!” the twins, leading them to tell lies about him. In Dorsey’s opinion, Mother continued to seek reunification “mostly with the twins Kyle and William.”
At the September 24, 2009 six-month review hearing, the matter was continued to November 9 for a contested hearing. On November 9, the hearing was put over to November 16.
The report prepared for the November hearing advised the court that the quadruplets’ counseling sessions had been terminated, but Federico was able to convince the provider to resume them. Conjoint counseling between Mother and the quadruplets was to begin in November. When advised of the prospect, the children immediately expressed their disdain for the idea, questioning why they were being asked to maintain contact with a person who had abused them. Collette, Heidi, and Brittany told Federico that Father continued to have anger issues. He screamed at the children and the foster mother. All of the children said they did not want to return to their parents’ *1350 home. Federico wrote that she “has never dealt with children who are so adamant about going home. As the court knows, children almost always want to go home, regardless of the type or severity of the abuse.”
The scheduled November conjoint counseling session did not occur because Mother cancelled after learning the therapist was not licensed. Mother protested despite the fact that the same therapist had been counseling the twins since May of 2009, and believed that they could safely return to Mother’s home.
In a December report for the contested six-month review hearing that was then scheduled for December 10, Federico advised the court that problems during visitation continued. During two visits, Father became embroiled in disputes with social workers at the foster family agency, during which he threatened and verbally abused them. One worker became so concerned that she contemplated calling the police. Because of Father’s constant quizzing of them and his outbursts, the quadruplets stated that they were afraid of Father and no longer wanted to visit with him. Attached to the report were letters the quadruplets wrote to the judge imploring him to help. They expressed fear of their parents, a desire never to return to their home, and a wish to remain with their foster mother. Based on input from the staff at the foster family agency, who cited safety and security concerns, DCFS recommended that future visits be held in a therapeutic setting and limited to one hour per week (visits had been two hours weekly).
At the December 10 hearing, Heidi testified in chambers. She repeated her claims that Mother abused her and said she did not want to visit with Mother any longer. She stated she did not want to live with either parent. Heidi denied that anyone told her to write a letter to the judge, claiming the siblings came up with the idea. Her testimony was suspended.
After the matter was recalled, the court noted that the parties had reached a stipulation. With respect to the quadruplets, conjoint counseling was to begin immediately, with one parent and one child participating at a time. Once weekly monitored visits were to take place at the DCFS office (or other approved location) and would not be held at the foster family agency. DCFS agreed to investigate the parent’s claim that the foster mother was the source of the quadruplets’ alienation from them. A progress report was scheduled for January 7, 2010, and a review hearing was set for July 22, 2010.
In a report prepared for the January 7 hearing, Federico wrote that Collette and Wesley were scheduled to visit the parents on December 16 at the DCFS office. The children came into the office but refused to enter the visiting room. Collette began to cry and asked why they were being forced to visit. *1351 After Collette and Wesley became tearful and more agitated, Federico met with a supervisor, who saw the children and cancelled the visit, believing it would be emotionally harmful to them. Federico opined that “beyond physically picking them up kicking and screaming there would have been no way to get them into a room.” A December 17 visit among Heidi, Brittany, and the parents was canceled after the children said they did not want the visit to take place.
On December 18, Mother had one brief conjoint counseling session with Collette. A session with Father did not take place because when the children arrived they were crying and screaming and refused to get out of the foster mother’s van. Mother had a second session scheduled for January 5, 2010. On January 4, she cancelled, stating that Kyle had a doctor’s appointment.
DCFS recommended that future visits take place in a therapeutic setting and only after the children’s therapist deemed them appropriate. DCFS asked to retain discretion to move the visits to a neutral setting.
At the January 7 hearing, the court spoke to the quadruplets. It explained that it was ordering the children to visit and to participate in counseling. Each child was asked whether he or she understood and each replied yes. The court amended the visitation order by directing that visits were to be conducted in a therapeutic setting. The court wanted the conjoint therapist “to observe them. And then the therapist needs to provide Ms. Federico with some direction as to how the visits should go from there.” The matter was continued to March 15, 2010, for a progress report.
Mother appealed from the September 2009 denial of her section 388 hearing and the January 7 orders. We affirmed. (In re Brittany C. (Oct. 18, 2010, B220605, B222771) [nonpub. opn.].)
After the January 7 hearing, the conjoint therapy between the parents and the quadruplets continued. It was agreed that Federico would transport the children to the clinic in order to avoid a reprise of the December incident when they refused to get out of the foster mother’s van.
On March 8, 2010, the therapist, Joey Tadie, sent a letter to Federico outlining the children’s progress. Tadie planned to conduct 20-minute sessions between one child and one parent. However, the children “continued to be extremely reluctant to meet with their parents. None of the children were able to sit in the same room with either parent for longer than 8 minutes, as they each became extremely upset and ran out of the room. Other times, they refused to enter the room and would instead stand in the hallway outside the therapy room.”
*1352 When shortening the sessions proved unsuccessful, Tadie changed their format. The “children were no longer asked to interact with their parents, but would instead participate in a short activity with the therapist (e.g.[,] small ji[g]saw puzzle, drawing) while the mother or father sat across the room, observing quietly.” Although Heidi and Brittany were able to remain in the room for the allotted time, Collette and Wesley were not. Instead, “both screamed obscenities at their parents, accused them of molesting them, would not follow therapist instructions, knocked over furniture and bolted from the room.” In addition, Heidi demonstrated passive-aggressive behavior by drawing a picture of father being eaten by a shark and writing the words “f... You.”
Tadie set forth the reasons for Collette’s and Wesley’s anger. In several sessions, they accused Mother “of abusing them by hitting them and touching their ‘private parts,’ but she has disputed this by saying that there is no evidence of abuse and that the children have been ‘brainwashed.’ ” This scenario was played out during every session the two children had with Mother, including one at which Mother was instructed not to verbally respond to them. The children reacted to Mother’s denials by becoming extremely agitated. They would curse at Mother, call her names, and run out of the room screaming.
Tadie concluded that “[t]he children do not appear to be currently able to benefit from conjoint sessions with either of their parents and neither children, parents [n]or the relationship between them is yet benefitted by these sessions.” He recommended individual therapy for the children and conducting further visits when the therapist determined that sufficient progress had been made. Tadie suggested that conjoint therapy with Heidi, Brittany, and the parents could continue. However, at that point, such therapy was not an option for Collette and Wesley.
As for the parents’ role in problems that arose during therapy, Tadie noted that the sessions had become “very unpredictable and difficult to manage. [j[] This unpredictability is compounded by the parents’ repeated claims that the children are being influenced by their foster mother to make accusations against them. . . . [f] Although the children’s mother and father have both stated they will cooperate with therapy, the mother has consistently denied that she abused the children in any way and has openly disagreed with the children’s claim during conjoint sessions.”
The contact among the siblings was no better. On February 12, 2010, the twins and quadruplets were present in the clinic and William asked Federico if he and Kyle could talk to the other children. Federico consented. At first, the quadruplets simply ignored William as he spoke. Then Collette accused *1353 William of knowing of the parents’ abuse and lying when he said it did not happen. Federico wrote, “William kept asking questions and Wesley finally blew up. He screamed at William that William used to hit them and do awful things to them and he knows it.” The meeting disintegrated into a shouting match and Federico asked the twins to leave. The children continued to ridicule each other through the glass of the room.
During a scheduled visit between the quadruplets and Chris, the quadruplets refused to go into the DCFS office and told Federico that she could not make them. Chris approached and attempted to talk to her siblings. A confrontation ensued with the quadruplets accusing the parents of misconduct and Chris denying that it took place. Eventually, the quadruplets left and began walking around the building. After they ignored the social workers’ request to stop, a supervisor called 911. Federico called Father, explained that the children had taken off, and requested that he pick up Chris. Federico found the children hiding and attempted to get them to come with her. They refused and began to run. The social workers lost sight of them. Torrance police officers arrived, found the children near some condominiums that abut the DCFS office and after a struggle (the officers required the arrival of a backup unit and a sergeant) managed to restrain and place them in a patrol car.
Upon arriving at the DCFS office, Father confronted Federico in the lobby and screamed at her, saying that Chris was left sobbing in front of the building. Father accused the quadruplets of intentionally causing Chris’s distress. After Federico left to continue to search for the quadruplets, Father began screaming and cursing at staff, calling them “a—holes.” He called the security guard a criminal. All the while, the lobby was filled with adults and children.
In its March 15, 2010 progress report, DCFS observed that the trauma of the visits with their siblings and parents was causing the quadruplets emotional harm and, given the episode during Chris’s visit, placed them at risk of physical harm. It recommended that the court suspend all visits, leave future visits to the discretion of the treating therapists, and order that all contact take place in a therapeutic setting.
At the March 15 hearing, the court ordered Dr. Michael Dishon to prepare an evaluation of the family pursuant to Evidence Code section 730. It discussed visitation and therapy issues and continued the matter to March 29.
A conjoint therapy session among Brittany, Heidi, and the parents took place on March 18. After the session, Brittany became agitated and questioned why she was being forced to see her parents. On March 25, Collette *1354 and Wesley had individual sessions scheduled with Joey Tadie. That day, Tadie called Federico and told her that the children had refused to go into the room with him. Tadie said he and the clinic director were going to discuss therapy plans for the children.
On March 26, Tadie called and stated that he and the clinic director felt that the agency could no longer provide adequate services for the children. The episode on the prior day with Collette and Wesley convinced Tadie that the children had been unable to establish a trusting relationship with him. He suggested that the children work with an individual therapist until such time as the therapist believes conjoint therapy should resume.
On March 29, the court learned the quadruplets were beginning weekly individual therapy sessions. Visitation and conjoint therapy was suspended. The matter was continued to May 5, 2010. The court wanted “written reports from the therapist and a recommendation about when we can start the therapeutic visitation and conjoint counseling.”
These timely appeals followed.
DISCUSSION
I. Chris’s Appeal Must Be Dismissed
Chris’s notice of appeal was signed by Father, who purported to sign on Chris’s behalf. There is no evidence in the record that Chris authorized the appeal.[5] What is clear is that Chris’s attorney and guardian ad litem appointed pursuant to the federal Child Abuse Prevention and Treatment Act (CAPTA; 42 U.S.C. § 5101 et seq.), Edward Tsang, did not file an appeal on Chris’s behalf.
Relying on In re Josiah Z. (2005) 36 Cal.4th 664 [31 Cal.Rptr.3d 472, 115 P.3d 1133], DCFS contends that only Chris’s attorney can file an appeal on her behalf. Chris responds the case holds that a minor’s attorney (or guardian ad litem if he or she does not have an attorney) has the responsibility to ascertain whether continued legal action is in the minor’s best interest. She asserts it does not stand for the proposition that only the attorney can act on the minor’s behalf. Chris argues that because she is in the physical custody and control of Father, he maintains the right to make decisions for her relating to her care, custody, or well-being.
*1355 We need not determine whether a minor’s attorney or guardian ad litem is the only person authorized to file an appeal on the minor’s behalf. We address one question. Is Father authorized to file an appeal on Chris’s behalf? Neither DCFS nor Chris has cited any authority on the issue and our research has not disclosed any. For policy reasons, we conclude that a parent in Father’s situation may not file an appeal on his or her child’s behalf.
A child is detained by DCFS because the child can no longer safely remain in the parent’s custody. At the first court appearance, an attorney is appointed to represent the child. The attorney, who also serves as the child’s CAPTA guardian ad litem (In re Josiah Z, supra, 36 Cal.4th at p. 680), “has a duty to ‘represent and protect the rights and best interests of the child.’ [Citations.]” (Id. at p. 681.) Throughout the proceedings, the parent and child have separate counsel because their interests are not necessarily the same. The parent’s goal is to reunify with the child. Depending on future events, reunification may or may not be in the child’s best interest. For the duration of the dependency proceedings, parent and child may be, and in this case are, in effect, adversaries. For this reason, logic and common sense dictate that a parent should not be authorized to make legal decisions relevant to the case on behalf of the child.
Chris attempts to avoid the clear conflict of interest she has with Father by asserting that the juvenile court placed her in Father’s custody and there is no indication that the placement was not appropriate. Chris’s argument ignores the fact that she is still a dependent of the juvenile court, due in part to Father’s conduct. The conflict between her interests and Father’s remains as long as the juvenile court has jurisdiction of the case. We need look no further for an example of a conflict materializing between parent and child than the case before us. The quadruplets’ attorney filed a brief in support of the orders being appealed by the parents.
Because Father was not authorized to file a notice of appeal on Chris’s behalf, Chris’s appeal must be dismissed.
II. The Juvenile Court’s Visitation Order Was Appropriate
As noted, the juvenile court ordered that visits were to be monitored and held in a therapeutic setting. Mother points out that at the time of the order, the quadruplets had not begun individual therapy and Collette and Wesley were no longer participating in conjoint therapy. As a result, Mother contends, the effect of the court’s order is to deny her visitation. In addition, Mother urges that the court abdicated its duty to order visitation by allowing the children to decide whether visits would take place. Father joins in Mother’s arguments.
*1356 We review an order setting visitation terms for abuse of discretion. (Los Angeles County Dept, of Children & Family Services v. Superior Court (David P.) (2006) 145 Cal.App.4th 692, 699, fn. 6 [51 Cal.Rptr.3d 816]; but see In re Mark L. (2001) 94 Cal.App.4th 573, 581, fn. 5 [114 Cal.Rptr.2d 499] [stating the reviewing court determines whether the order is supported by substantial evidence].) We will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination. (In re Stephanie M. (1994) 7 Cal.4th 295, 318 [27 Cal.Rptr.2d 595, 867 P.2d 706].)
During reunification efforts, visitation generally must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A).) At the same time, visitation orders must provide for “flexibility in response to the changing needs of the child and to dynamic family circumstances.” (In re S.H. (2003) 111 Cal.App.4th 310, 317 [3 Cal.Rptr.3d 465].) “In addition, the parents’ interest in the care, custody and companionship of their children is not to be maintained at the child’s expense; the child’s input and refusal and the possible adverse consequences if a visit is forced against the child’s will are factors to be considered in administering visitation.” (Ibid.)
Mother takes the position that if the court wanted visits to take place in a therapeutic setting, it “had a statutory per se obligation to fashion a visitation order that could be complied with.” She maintains the court’s order is illusory. The children had not yet started individual therapy when the court fashioned its order. In addition, as the court acknowledged, Collette and Wesley were steadfastly refusing to participate in counseling. Thus, she asserts, the court had no idea when, or if, visits would ever occur.
The court’s latest visitation order must be viewed in the context of the family dynamics in play. There is no question that from the beginning of this case, the quadruplets have not been merely reluctant to visit with their parents. The children have expressed on a number of occasions that they fear Father and Mother. Nonetheless, the court endeavored to find a way to facilitate visits. At first, visits took place at a foster family agency, monitored by agency employees. During that period, Father harassed and threatened the workers, Mother unilaterally refused to take part in visits, and, during one visit, the quadruplets unleashed a tirade of accusations at Mother. The agency informed Federico that it no longer wanted the visits held at their location due to safety and security concerns. By stipulation, the visits were moved to DCFS offices. Matters did not improve. On one occasion, Collette and Wesley refused to enter the visitation room. They were screaming and crying. The children were so distraught, a DCFS supervisor cancelled the visit, deeming it too emotionally traumatic for them. During another visit, the quadruplets ran from the office, necessitating police intervention to safely corral them. The court did not give up. It ordered visits to take place during *1357 conjoint therapy sessions. The therapist tried a number of methods to achieve successful results. He started with 20-minute sessions. The children could not tolerate them and they would leave the room crying and screaming. The sessions were shortened to eight minutes, but the results were the same. Finally, he had the children sitting quietly, working on some mundane task, and eschewing all contact with their parents. Collette and Wesley could not make it through those limited sessions. The therapist tried to counsel Collette and Wesley separately, but was unsuccessful. Out of options, he recommended that further sessions be suspended, as neither the children nor the parent-child relationship benefited from the therapy. Heeding the therapist’s recommendation, the court suspended visits and ordered individual therapy for the quadruplets in the hope that future visits could take place.
Mother relies on In re C.C. (2009) 172 Cal.App.4th 1481, 1491-1492 [92 Cal.Rptr.3d 168], and argues that the court could not suspend visitation unless it found that the children’s safety would be harmed by further visits. Although our colleagues in Division Seven read section 362.1, subdivision (a)(1)(B) and reached that conclusion, they did not discuss other cases that interpret the same statute to mean that a court may deny visitation upon a finding of detriment. (In re Nicholas B. (2001) 88 Cal.App.4th 1126, 1138 [106 Cal.Rptr.2d 465]; In re Luke L. (1996) 44 Cal.App.4th 670, 679 [52 Cal.Rptr.2d 53].) Detriment includes harm to the child’s emotional well-being. (In re Christopher H. (1996) 50 Cal.App.4th 1001, 1008 [57 Cal.Rptr.2d 861] [“The court may deny a parent visitation only if visitation would be harmful to the child’s emotional well-being.”].) Assuming In re C.C. is correctly decided, the juvenile court implicitly found that visits put the quadruplets at risk of physical harm. In discussing the episode during Chris’s visit, the court stated: “My other option is to have the children running around in the middle of the street with police officers chasing them, police officers chasing them to the extent that they have to call for backup because one officer or two officers can’t control the children as they’re running amok. . . . [I]n terms of physical risk, you could [not] have any more physical risk than kids running in the street, running amok on Sepulveda and [Del Amo], wherever it is. So that isn’t going to happen either.”
We also determine that a court has the power to suspend visits when continuing them would be harmful to a child’s emotional well-being. If that were not the case, a court would be required to sit idly by while a child suffered extreme emotional damage caused by ongoing visits. It makes little sense to continue visits when they amount to nothing more than either expletive-laced tirades (in the case of Collette and Wesley) or an utter lack of interaction (in the case of Heidi and Brittany). Visits of that nature are hardly consistent with the well-being of the children. There is little question that the quadruplets are severely emotionally damaged. Parents’ counsel discussed the possibility of having them evaluated by the State Department of Mental *1358 Health. As the court noted, “Well, it sounds like both Mother and Father’s counsel believe that the children are seriously emotionally damaged. Otherwise, [a mental health evaluation] wouldn’t be appropriate. So I take that [as a] concession by the parents’ counsel to indicate that there is a serious emotional issue involved here.” Neither counsel disputed the court’s characterization of the situation. The court’s effort to return the family back to square one by ordering individual therapy for the children in the hope that they will become emotionally prepared to engage in future visits is hardly arbitrary. If anything, it appears to be the only hope this family has of reuniting.
Nor do we agree with Mother’s claim that the court improperly delegated to the children the power to determine whether visits would take place. Mother claims the quadruplets were allowed to dictate whether visits would occur by refusing to participate. She argues, “[e]nough is enough. It is time for the juvenile court to tell these nine-year-old children that they are not in charge.” We are not persuaded that the court has left the visitation decision to the children.
Mother’s reliance on In re S.H., supra, 111 Cal.App.4th 310, is misplaced. There, the trial court was found to have erred when it issued a visitation order that allowed the children to dictate whether visits would occur. (Id. at pp. 317-319.) The appellate panel acknowledged that a child may be allowed to refuse to attend a particular visit, however, “to prevent the child from exercising a de facto veto power, there must be some assurance that, should that occur, another visit will be scheduled and actually take place.” (Id. at p. 319.) The court cautioned that in no event “may the child’s wishes be the sole factor in determining whether any visitation takes place.” (Ibid.)
Here, while some visits did not take place because one or more of the quadruplets refused to participate, they were rescheduled. The children did not possess the power to halt the visits. The court made it clear that the children were required to attend. However, no one could force them to act in a particular way once the visits began. Moreover, the children’s wishes were not the sole factor in the court’s decision to suspend visitation. It was the therapist who halted the family’s counseling sessions and the court was unwilling to continue visits in a nontherapeutic setting.
One need not be an expert to see that this family is damaged, perhaps beyond repair. There was nothing improper in the court taking a step back to consider the recommendations of a therapist and the desires of the children before attempting to fashion a visitation plan that has a hope of success.
*1359 DISPOSITION
The visitation order is affirmed.
Epstein, P. J., and Willhite, J., concurred.

 Since the inception of this case, Christopher has taken on a female persona and prefers to be referred to as Chris. As the parties and reports now refer to the child as a female named Chris, to maintain consistency and to avoid confusion we will do the same.

 As the twins have been placed with Mother and are not parties to this appeal, we will focus on the events involving the quadruplets.

 All further statutory references are to the Welfare and Institutions Code.

 As an indication of her clear preference for the twins, Mother completed two nine-hour unmonitored visits with them during the month of August without incident. On August 15, she had the twins with her when she refused to go into the foster family agency to visit the quadruplets. The day after she asked the quadruplets whether they wanted to visit with her, she took the twins to Soak City and Knott’s Berry Farm.

 We note that Chris’s appellate counsel “represents to this Court, as an officer of the Court, that Chris informed appellate counsel she authorized the notice of appeal.” This belated “authorization,” that is unsubstantiated by any evidence in the record, provides little assistance.