Filed 6/10/13  In re Megan G. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MEGAN G., et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA CHILDREN & FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HEATHER G.,<br><br>    Defendant and Appellant. | A134922<br><br>(Contra Costa County Super. Ct. Nos. J1100593 & J1100594) |

Heather G. appeals from juvenile court orders taking jurisdiction over her two children under Welfare and Institutions Code section 300.  She contends the court erred in overruling her demurrer to the petitions, and abused its discretion and violated her constitutional rights by unduly limiting cross-examination of her daughter.  She further contends there was insufficient evidence to support the petitions.[1]  We affirm.

---

[1] Anticipating certain arguments would be raised by respondent, appellant additionally urges that if trial counsel failed to adequately preserve her claims regarding limitations on cross-examination, she received ineffective assistance of counsel.  As respondent has expressly chosen not to raise the claims appellant anticipated, we need not address her ineffective assistance of counsel arguments.

1

**STATEMENT OF THE CASE AND FACTS**

On April 6, 2011, the Contra Costa County Bureau of Children and Family Services ("Bureau") filed petitions alleging that Megan G. and Matthew G., then 11 and 15 years old, respectively, came within the provisions of Welfare and Institutions Code section 300.[2] As subsequently amended,[3] both petitions alleged failure to protect under section 300, subdivision (b), in that appellant had failed to protect the child from appellant's live-in boyfriend Glenn E., "who has physically and emotionally abused the child on an ongoing basis for at least three years." Megan's petition alleged under section 300, subdivision (d), that Megan had been sexually molested in appellant's home by Glenn "on at least three occasions over a two year period including touching her vagina with his hand and penis, touching her breasts and trying to get the child to touch his penis" (allegation d-1) and that appellant had failed to protect Megan from ongoing sexual abuse by Glenn in that despite being told by Megan that Glenn had touched her inappropriately, appellant did not believe Megan and failed to take any action to prevent further abuse (allegation d-2). Megan's petition additionally alleged under section 300, subdivision (d), that Megan was at risk of sexual abuse in appellant's home in that Matthew "touched the child on her vagina on at least one occasion in December 2010 while at her father's home and the child's mother refuses to believe the child's

---

[2] Further statutory references will be to the Welfare and Institutions Code unless otherwise specified.

[3] The Bureau filed amended petitions as to both children on June 17, followed on June 20 by an additional amended petition as to Megan adding the allegations of sexual touching by Matthew.

The original petition concerning Megan alleged failure to protect under section 300, subdivision (b), in that appellant's boyfriend "inappropriately touched" Megan in or about December 2008, and "on two other occasions," and Megan told appellant approximately one year prior to the filing of the petition but appellant did not take appropriate steps to protect Megan. The same facts were alleged under section 300, subdivision (d), to show that appellant had failed to protect Megan adequately from sexual abuse and that appellant knew or reasonably should have known Megan was in danger of sexual abuse. Matthew's petition alleged these same facts under section 300, subdivision (j), sibling abuse.

disclosure." Matthew's petition repeated the allegations concerning Megan's sexual abuse by Glenn to establish jurisdiction under section 300, subdivision (j), based on sibling abuse.

The case came to the Bureau's attention on April 1, 2011, when Megan's school principal contacted the police after Megan's school bus driver (who was also her neighbor) reported Megan having told her that appellant's boyfriend had touched Megan's breasts and genital area and that Matthew had also touched her sexually. In an interview that day, Megan told Detective Hart that in December 2008, while she was showering in Glenn's bathroom, Glenn came in wearing pajama bottoms but was naked when she got out of the shower. She had her arms clenched over her chest and he "tried to pry her arms to make her touch his penis," as well as touching her vagina with his hands and penis. In two other " 'less severe' " incidents, Glenn touched her chest and vaginal area over her clothes while she was doing homework at the computer and told her not to tell her mother. Megan said that she had told appellant about the shower incident about a year before, while they were watching a Dr. Phil show on the topic of telling someone if something inappropriate happened, and appellant believed her. Megan asked appellant not to discuss what she said with Glenn because "they had nowhere else to go." Megan also told the police that Matthew touched her on three occasions when they were visiting their father. Most recently, in December 2010, when Megan was sleeping on the living room couch and Matthew on the floor, he called her to the floor, put his hands down her pajama bottoms and touched her vagina.

Officer Gillespie, who was present during this interview, noted that Megan was tearful and had difficulty speaking about what had happened to her, and that her statement was very detailed and stayed consistent when she was questioned. After the interview, Megan asked to talk appellant, who came into the office, sat across from Megan, crossed her arms and legs and said, " 'What's going on.' " Megan told her what she had told the police about Glenn and when appellant did not respond, Megan said, " 'Remember mom when I told you about when [Glenn] had touched me after I got out of the shower.' Mother said, 'You didn't tell me THAT.' Megan said 'Yes, I did.

3

Remember, when we were watching Dr. Phil and he said that we should not be afraid to tell our parents if something bad was happening. I told you, you sent Matt out of the room and talked with me about it. But then you didn't do anything about it. Why didn't you do anything about it?' " Megan began to cry; appellant kept her arms crossed and made an exhaling noise that made it clear she did not believe Megan. Appellant asked Gillespie what would happen now, hugged Megan once and left the room. Officer Gillespie found appellant's interaction with Megan "uncharacteristically cold and harsh," as she did not attempt to comfort the "visibly sobbing" child.

Officer Gillespie reported that appellant told him she had been with Glenn for 10 years and lived with him since 2004; tensions were high because Glenn was difficult to live with and the children did not like him because he made them do chores and took away privileges. Appellant had recently returned to school in order to get a job and be able to move out of Glenn's house. She left the children with Glenn when she was at school, and on Tuesday evenings Megan stayed home with Glenn while appellant took Matthew to Boy Scouts. Megan never voiced concern about staying home alone with Glenn. Megan did not usually spend much time with Glenn and was not usually nice to him, but would say good morning or good night and sometimes hugged him.

Appellant recalled that about a year before, while she was in the living room with Megan and Matthew, Megan complained about being touched by Glenn. Appellant asked her to describe what she was talking about but Megan had no description. Appellant looked at Matthew and "they both shook their heads and said, 'No, he would never do that,' " and Megan did not bring it up again. When the officer pressed for details, appellant became defensive and insisted Glenn had never molested Megan. Appellant said that she had been a victim of molest as a child and would " '[n]ever let her children stay in a house where they were in danger.' " She said that she and Glenn allow the children privacy to shower and that Glenn helped her discipline the children but did not spank or physically discipline them. Appellant thought Megan might have made the accusations because she was angry with Glenn for grounding her. Officer Gillespie noted

4

that appellant was so quick to defend herself or Glenn that it appeared she was not considering whether there was a possibility Megan's accusation could be true.

As related in the Bureau's report, appellant told Detective Hart that she did not follow up when Megan told her about Glenn touching her inappropriately, saying Megan gave " 'vague information, which did not sound credible.' " Appellant said she wanted to end her relationship with Glenn but had nowhere else to go because he was the breadwinner, and that she had no knowledge of inappropriate touching by Matthew.

One of Megan's friends told Officer Gillespie that Megan often said how much she dislikes Glenn, complaining about him spanking her too much, hitting her and making her do a lot of work around the house. In March, Megan said that when appellant was at school on Thursdays, Glenn would walk in while Megan was taking a shower and ask if she wanted help; on at least two occasions, he had "come into the shower while she was taking a shower and touch[ed] 'her parts' " and then " 'jack[ed] off' " (which the child described as "touching his penis"). Another friend said that Megan complained in March that after appellant went to school, Glenn would come into the bathroom while Megan was showering and "try to touch her private parts," and that this "had been happening since she was nine years old and had happened more than once." Megan described a time Glenn came into the shower with her, wearing his underpants, and said that once Glenn pretended to be tickling her and touched her breasts and vagina. Megan's friend told her to tell someone but Megan did not want to because she did not want to be taken away from her mother. Megan told her friend that she had tried to tell appellant but appellant did not believe her, and she thought appellant was afraid Glenn would assault her if she confronted him, and scared to deal with the incident because they had nowhere else to stay.

Interviewed by Detective Hart, Matthew initially "denied everything." He did not remember being sent out of the room so appellant could talk to Megan about a Dr. Phil show, and said that at their father's house, Megan had moved to the floor while they were talking so they could be quieter and not get in trouble. He did not know about Glenn sexually touching Megan and denied that Glenn had touched him sexually.

5

The bus driver, Ms. O'Donnell, told Officer Gillespie that Megan said she had been showering in her parent's bathroom when Glenn came in, wearing pajama bottoms, and asked if he could help her shower. He left when she said no, but when she got out of the shower in a towel, he was naked in the bedroom. Megan told O'Donnell that she told appellant about the incident and was not sure whether appellant had forgotten. Megan also said that Matthew had touched her breasts and vaginal area.

An interview was scheduled for Megan on Monday, April 4, at the Children's Interview Center (CIC). Megan was to stay with her maternal grandmother, Pamela K., for the weekend. Appellant and Pamela were told that Glenn and Matthew were to have no contact with Megan; appellant could call but not discuss the allegations. At 5:45 p.m. that Sunday, Megan called the social worker saying she had lied about the allegations and had been angry with Glenn because he had grounded her.

At the interview on April 4, Megan began by saying she "had been thinking about things the wrong way" and "now knows that what she said happened with [Glenn] was in fact a dream."[4] Megan said she had believed what happened was real until Friday and thought she was telling the truth when she spoke to the police as well as when she told her friend at school. Her friend told her to tell the bus driver and she did so thinking that the bus driver would keep a secret. After thinking a lot over the weekend, she thought she might have had this dream because of the tickle fights she had with Glenn. In the dream, Glenn came into the bathroom with his pants on, left and then returned with nothing on. He asked if she wanted help with her shower and he was there when she got out; she saw his private parts; he picked her up and put her on the bed; her towel fell and he would not let her grab it; he tried to open her legs and to pin her down on the bed so she could not get the towel. Then the alarm went off for her to wake up.

---

[4] The Bureau's report states that the district attorney, Detective Hart, appellant and Christopher, the children's father, were also present. The DVD recording reflects that no one else was physically present in the room where the interview took place.

Megan said she felt confused, "[o]ne side of her" feeling like it was a dream, another side feeling like it was real and another feeling like she "took it all the wrong way." She said the shower incident happened one time and tickling happened two times a day and sometimes two times a week. Megan said she would start the tickling, and Glenn "accidently gets his thumb stuck in her shirt or her pants"; these episodes would happen while appellant was at the store or in the bathroom, and Matthew had never seen Glenn tickle her. About a year before, while watching Dr. Phil, she told appellant Glenn had been inappropriate with her and gave details, and she thought appellant had talked to Glenn about it.

Megan said appellant had come to her grandmother's house over the weekend to see how she was doing. During the weekend, Megan had flashbacks about how mad she was at Glenn for grounding her for a month. She told appellant why she was mad and appellant agreed with her. Megan wanted to go home and thought if she explained herself "hard enough" at the interview, "things can go back to normal." She said appellant hoped they could go to counseling, and appellant could not eat or sleep over the weekend because she was worried Megan would be taken away. Megan said Glenn is "really nice," takes them out to dinner, and is nice to appellant, and that they "do cool stuff together." He "sometimes gets mad because he wants them to do chores" and he ignores Megan when he is mad at appellant. Megan also said Matthew had touched her accidentally and she thought "she misunderstood what he was doing because he would never do anything to her."

The social worker spoke with appellant, who said she "absolutely" knew neither Glenn nor Matthew would touch Megan. Megan had not told appellant about Glenn touching her. Megan had "talked to her about the Dr. Phil show" but did not provide any details; Megan said Glenn had brought her a towel into her bathroom, and appellant told her there was nothing wrong with this and she must have misunderstood his intentions. Appellant said Megan was headstrong and in a rebellious stage, and had been " 'butting heads' " with Glenn, a stage Matthew had gone through with Glenn and grown out of. According to appellant, Megan "does not know when to stop" and Glenn sometimes gets

7

irritated when Megan continues tickling him after he tells her to stop. Tension between Glenn and Megan had been building and Megan had been holding a grudge. Two weekends before, while appellant was away, Megan was at a friend's house and Glenn told her to call him before noon. Megan called appellant at 12:02 p.m. and appellant told her to call Glenn; Glenn grounded her for a month and took away her phone for calling late. The day before Megan voiced her allegations, Glenn told her she could get off restriction early if she cleaned his truck, and Megan appeared happy when appellant dropped her at the bus stop on April 1, then appellant received the call from school.

Appellant did not believe Matthew would touch Megan because the two could not stand to be around each other, and suggested Megan might have made the allegations because Matthew would not let her hang out with him or play with his Xbox.

Appellant said that when she went to visit Megan over the weekend, Glenn told her to tell Megan he loved her and would forgive her. Appellant wanted Megan home and said they would attend family counseling. She said Glenn felt hurt about the allegations and Matthew was angry.

Appellant told the social worker that Matthew had been diagnosed with Attention Deficit Hyperactivity Disorder and Bipolar disorder as a young child and labeled as emotionally disturbed; he took various medications under the supervision of a psychiatrist and saw a counselor at school. Matthew told the social worker he did not want to discuss Megan's allegations, said he was " 'blown away' " that Megan would say this about him and asked, "Why Glen[n] and me?" Matthew said that he got along " 'pretty good' " with Glenn and that Glenn yelled when he was disturbed about his ex-wife and sometimes was moody. Matthew thought Megan needed to go to counseling by herself. He did not want to attend family counseling because he did not want to talk to Megan and said he talked openly and honestly with his school counselor.

The children's father, Christopher, told the social worker that he called Megan on Friday night, after appellant told him Megan had reported Glenn and Matthew having done something to her. Megan sounded "credible" to him. On Sunday, Christopher took Matthew out for lunch and Matthew said Megan was " 'full of crap.' " About 3:00 p.m.,

8

appellant called and led Christopher to believe she was going to "bully Megan into saying that she made all this up," saying "she 'is not going to let any government agency take over our life.' " Christopher came early to the interview on April 4 in order to let someone know he believed appellant had bullied Megan into changing her story. Christopher did not feel Megan was safe at appellant's house and wanted to take her home with him that day. He had been concerned about Megan living in Glenn's home because the children had told him that Glenn had thrown Matthew against a wall in the past, leaving no marks, and said they did not like Glenn.

Appellant was told after Megan's interview that while Megan said her story had been a dream, her body language and difficulty maintaining the story made it apparent she had been coached or coerced. Appellant got angry, saying, " 'This is crap. She made it up.' " She also got angry when Detective Hart told her he was concerned about her inability to consider that something might have happened to Megan and advised her that Megan would not be returning home because there was a question about her safety.

Pamela K. reported that on Sunday Megan was crying while sitting on the couch with appellant and Pamela told appellant she was not supposed to be talking to Megan about the case. Appellant took Megan out for ice cream, then later took her out and bought her new clothes; when they returned, Megan told Pamela, " 'Now I'm gonna say I made it all up.' " Pamela asked appellant what she was doing. Pamela felt appellant did not want to rock the boat with Glenn. She said the children did not get along with Glenn, who was unpredictable, yelled at appellant and was possessive. Pamela had the children stay with her every other weekend, when Glenn's children came to visit, and said that when his children were there, Glenn treated Megan and Matthew like servants. Megan had told her two or three months before that she had watched a Dr. Phil show and told appellant that Glenn had touched her, but appellant did not want to hear it.

Matthew's therapist, Will Bove, told the social worker that Matthew told him weekly "how unhappy he is with [Glenn]." Appellant had expressed to Bove that she was trying to get her life together so she could leave Glenn; Bove felt she was trying "really hard" and the children were the most important thing to her. Bove said appellant

9

struggled with her own mental health challenges, there were conflicts between her and Glenn that presented a challenge for the children, Glenn got stricter with the children when he was upset with appellant, and the children had spent all of the past summer with Pamela because Glenn threatened Matthew. Bove had never had any sexual concerns about Matthew.

In recommending that a petition be filed, the social worker noted, along with Megan's allegations, that appellant did not have the capacity to keep Megan safe because she took no action after Megan told her about the shower incident and continued to refuse to consider that there had been any sexual inappropriateness; that although appellant was told not to talk to Megan about the case during the weekend preceding the interview, she took Megan out for ice cream and shopping, after which Megan said she was going to say she had lied to the police; and that Megan's recantation at the interview did not appear believable to observers.

At the time of the April 7 detention hearing, Megan was living with Christopher and Matthew was living with appellant and Glenn. The Bureau recommended that Megan be detained in out-of-home placement and Matthew remain in appellant's custody with court-ordered services. The court detained both children from appellant's custody and suspended appellant's visitation pending the jurisdictional hearing. Megan was placed with Christopher and the court ordered no contact between Megan and Glenn. Matthew was temporarily placed with family friends.[5]

---

[5] On May 18, the social worker informed the court that Matthew's caretakers had reported appellant making various attempts to contact Matthew in violation of the court's order prohibiting contact pending the jurisdictional hearing. A social work supervisor spoke with appellant, who said she thought supervised contact was permitted. When the social worker subsequently advised appellant not to contact Matthew until the court granted visitation, appellant denied having done so, became angry and emotional, and said the foster parents were being untruthful. At a hearing on May 19, the court admonished appellant that contact was prohibited. On June 20, the court issued an order to show cause regarding finding appellant in contempt of court for sending Matthew a text message on May 28, in violation of court orders.

10

Megan was interviewed a second time at CIC on August 2. According to a summary of Detective Hart's description of the interview, after promising to tell the truth, Megan stated that Glenn " 'got mad a lot' " and spanked her and Matthew with his hands, a board or a belt, and that appellant knew about this. Glenn would make her pull down her pants when he spanked her on the buttocks, which would sometimes leave red marks for approximately one week. He once told her to cover herself when they went swimming because he did not want others to see the marks. Appellant once hit her with the board Glenn used, with Glenn urging her to " 'hit hard.' " Appellant once intervened when Glenn was attempting to hit Matthew.

Megan said she was upset that appellant did not believe her allegations of sexual abuse. She stated that when she was nine or ten years old, she was taking a shower in " 'Glenn's bathroom' " and he walked in, " 'butt naked' " and asked if she wanted help washing her hair. He " 'kept trying to get in the shower with her' " while she was turning it on and getting in, then left but returned when she got out and asked if she "needed help 'drying off.' " She wrapped a towel around herself and walked to the hallway, then Glenn pushed her back into the bedroom and onto the bed, touched her chest/breasts and vaginal areas with his hands and tried to make her touch his penis. Glenn was naked. He stopped touching her when he heard her brother turn off the shower in the other bathroom. Megan told appellant about the incident but appellant did not seem to believe her. This was the only time Glenn touched her sexually in "that 'extreme' manner," but there were numerous other times when he would pull her shirt or pants down while " 'tickling' " her and would " 'look down' her shirt." She also described Glenn approaching while she was doing homework at the desk, "hitting her hand with his exposed penis" and urging her to touch it. She said this happened three or four times.

Asked about saying " 'something different' " at her prior interview, Megan described appellant taking her for ice cream and trying to get her to change her story. Appellant did not believe that Megan was telling the truth about the allegations and told Megan to change her story so she would be able to come home, continuing to talk about the case even after Megan told her they were not supposed to discuss it. Megan came up

11

with the idea of saying the events she had reported had been a dream and did not talk to appellant about this.

Megan stated that she liked living at her father's house and felt safe there, but was "not thrilled" about living in Sacramento. She felt " 'fine' " about not being able to speak with appellant and did not want to see her. She said she would like to see her brother. She was "clear" that the events she reported about Matthew had really happened.

At the jurisdiction hearing on September 14, Megan testified that she did not recall what details she gave when she told her bus driver that Glenn and Matthew had molested her. She was upset when Ms. O'Donnell told her she had to inform the authorities, because she had wanted what she said to be a secret between herself, the two friends who were with her, and O'Donnell. Detective Hart came to school to talk to Megan and she told him the truth. When she went with her grandmother to Glenn's house to get her belongings, appellant was crying and packing a bag for her, and would barely talk to her when Megan tried to say goodbye.

Concerning the shower incident, Megan testified that as she was about to get into the shower, Glenn came into the bathroom, naked, and asked if she needed help in the shower. She said no and tried to cover herself, he tried to get in the shower with her as she tried to push him out, and finally he left. After the shower, as Megan was walking down the hall to her room, Glenn pushed her back, picked her up and put her on the bed. He kept trying to look at her, she tried to cover herself, the towel dropped on the floor, he tried to open her legs as she resisted, and he finally kept her legs open and "tried to get a good look at me." He repeatedly told her to touch his penis, and she held her hands together so she could not. He touched "the upper part" of her body.

Megan did not remember the specifics of what she told her friends about Glenn's actions, but testified that everything she told them was true.

Asked whether she had told appellant about the shower incident, Megan said that about a month after it, and a year before her disclosures to Ms. O'Donnell, while watching an episode of Dr. Phil, "out of nowhere" appellant told her not to be afraid to tell her "anything." Megan told her "everything" and appellant looked at her and said

"okay." Appellant did not do anything about it and Megan thought appellant did not care.

During the weekend before her first interview, appellant took Megan to Baskin Robbins and the Army store, and spoke with her about what Megan had told the police. Megan remembered saying, "I am the victim here," and thought appellant responded, "I don't give a rat's A." Megan felt appellant did not believe her and was trying to get her to change her story, because appellant kept asking whether Megan wanted to come home and told her, "I don't know how you can change this whole thing around but you can try." When Megan asked "how," appellant said, "just change your story." Megan came up with the idea of saying it was just a dream.

Megan testified that she was lying when she said at her first interview that "everything was a dream" and that what she said in her second interview was true. She did not make up what she said about the shower incident or about how Glenn treated her and Matthew. Megan testified, "I told my friends everything that's ever happened to me, like my life was a horror movie. It just happened over and over and over. Like Glenn would yell at us for no reason. He would spank us. And I was always terrified that like whenever my mom would pick us up at the bus stop Matt or I would ask her if Glenn was home yet. And I was—like felt scared if he was because—because somehow, someway Glenn had a bad day at work, so whenever he has bad days he usually would yell at us. And when he yelled at us, like, he would tell us to go, like, clean the backyard, go clean his room, go do the dishes and stuff like that. [¶] And I remember I have a recording on my iPod of him yelling at me because he said that I took too long of a shower and that I did the dishes wrong and to do them again. . . . He would, like, he shoved my brother against the wall twice, smacked him on the back of the head when he was eating, and then he shoved him against the sliding glass door."

Megan testified that Glenn spanked her with a belt, a hand, or a polished wooden board, and that appellant observed this "[a] couple [of] times." She thought appellant had once seen Glenn shove Matthew against the wall and had seen Glenn yell at her. Megan did not like Glenn but denied making up any of the allegations because she did not like

13

him. On cross-examination by Christopher's attorney, Megan testified that aside from the shower incident, Glenn did not try to touch her or get her to touch him.

The recordings of Megan's interviews at CIC were played at the jurisdictional hearing and admitted into evidence.[6]

Matthew testified that he did not recall Megan saying anything about Glenn while they were watching a Dr. Phil episode with appellant, but he did remember a time in the car when Megan said something about Glenn inappropriately touching her and appellant said, "what, he would never do that." Matthew thought this was during a time when Megan was grounded. He remembered Megan getting grounded for calling Glenn a minute late, and that she stayed angry about it for a "pretty long time," but he did not remember whether this was close to April 1. During the month preceding April 1, Megan did not seem afraid to be near Glenn, and she would initiate the tickle fights that she and Glenn "always" had. Megan would try to avoid Glenn when Glenn was in a bad mood or had yelled at them, as Matthew said they all did.

Matthew did not remember what he said to the police officers on April 1. When asked whether the officers had asked him if he had ever sexually touched Megan, he asserted his Fifth Amendment right to remain silent. He testified that Megan had lied about him in the past.

Matthew acknowledged that he was telling the truth when he told the social worker that he got along "pretty well" with Glenn, but stated that he was "partly" afraid of Glenn. As he had previously told the social workers, he wanted to go home with appellant, but not with Glenn there. Matthew testified that Glenn was mentally abusive toward him and had been physically abusive in the past, most recently two or three years before. The physical abuse consisted of spanking and pushing Matthew; on one

---

[6] The recording of the first interview was viewed by the parties and court; the recording of the second was the subject of some dispute as to the need for the court to view the recording, technical difficulties in watching it and issues about transcribing it, and it was ultimately agreed that the DVD would be admitted for the court to watch on its own, without a transcript.

occasion, Glenn grabbed Matthew by the back of the neck and slapped him. The mental abuse was name calling and being "mean." Glenn would become agitated use a loud and scary voice, and Matthew would be afraid for appellant's and Megan's safety and "sometimes" his own. Glenn would call appellant the "B word" and "tell her to F off," and appellant and the children would leave because they "couldn't deal with him." On one occasion, appellant and the children stayed in the car overnight in a city park because Glenn either "kicked [them] out" of the house or "was being a total butt-head."

Matthew described having a dream in which appellant was looking in the attic and Glenn kicked the ladder, hurt her and left her lying on the floor. Matthew woke up worried about appellant. He told the social worker about this dream, as well as that Glenn had been physically abusive toward appellant. Matthew testified that one day "during all of this" appellant was crying and went into the room with Glenn, Glenn told her to stop a couple of times and then Matthew heard "a sound like she got punched in the stomach, like she lost wind or something like that." She came out of the room, no longer crying, Matthew asked if Glenn had hit her, and she denied it. Another time, Glenn was mad at Matthew, appellant was trying to protect Matthew and Glenn grabbed and pushed appellant. Matthew stated that Glenn and appellant both deny this but he saw it. Matthew thought the police had once been called to the house because of fights between appellant and Glenn. Glenn's moods were unpredictable and Matthew told appellant "[a]ll the time" that he was concerned about Glenn's behavior. Matthew had tried to get appellant to leave Glenn "[m]any times" but she said they had nowhere else to go.

Pamela K. testified that prior to April 1, Megan told her "something about the bathroom and a towel" but never said anything about "touching." Pamela asked if Megan wanted her to talk to appellant and Megan said "no, don't say anything to mom because then she gets mad at me." Pamela acknowledged that she had an interest in making sure her grandchildren were protected from abuse and that she had once called Child Protective Services because she felt appellant was yelling at Matthew a lot. She testified that the children complained to her about Glenn yelling at them a lot but she had not

15

heard about physical abuse. Pamela knew that Glenn abused appellant because appellant told her so on an occasion in 2005 or 2006, when appellant needed Pamela to give her money to come over the bridge to Pamela's house. She had heard Glenn call appellant names like "[b]itch." Megan had told Pamela about having to spend a night in appellant's car in a park. Pamela had told appellant that she thought the situation was bad for the children and for appellant, and that appellant should live somewhere else. She testified that Glenn was "a bully" and a "controlling person."

Appellant's testimony was presented in a declaration.[7] She stated that while watching the Dr. Phil show, Megan said something about "Glenn, a towel and a shower" but she never said anything about Glenn touching her or "went into any detail about any specific event." She had "no idea what Matt is talking about" regarding statements Megan made in the car. When asked by the police at Megan's school on April 1 if she thought Glenn could have done what Megan reported, appellant answered "without hesitation, No way, not in a million years would he ever do anything like that." Regarding the police report description of her conduct with Megan, appellant denied that she was "cold and harsh," stating that she was in shock and did not know how to act, and "couldn't say anything or ask about any details to Megan so I gave her a hug and walked out of the room."

Appellant stated that she was told she "could not have any contact" with Megan during the weekend Megan stayed with Pamela, and that "if I did see her I could not discuss this matter with her." Appellant went to Pamela's that Saturday, asked Megan how she was doing, gave her a hug and told her Glenn wasn't mad at her, forgave her and wanted her home. Megan said she wanted to come home, appellant told her "she had the power to do that," Megan asked what to do and appellant said she did not know. On Sunday, appellant picked Megan up and took her to Baskin Robins. Megan spilled some

---

[7] The declaration was accepted by stipulation as an offer of proof, with the exception of certain portions as to which the court sustained objections.

ice cream on her pants and, because Megan had only one pair of jeans for the weekend, appellant took her to the store to buy new jeans for Megan and for herself.

About seven years before, after appellant and Glenn had an argument and appellant did not want to stay at the house, she left with the children and stayed in the car at the park because she did not have money for gas or the bridge. They " 'camped' out" and the children had breakfast, were groomed and went to school the next day.

Appellant stated that Glenn would yell at the children when they did " 'stupid' things such as, not doing their chores or for leaving the lights on after telling them several times to turn them off," and if this did not work, he would "give them sentences to write." Once, Glenn "yelled in Matt's face," appellant got between them and "nothing ever became of it." Appellant never observed any physical abuse by Glenn toward the children. Glenn would spank the children "maybe once on the bottom" and she was always in the room when he did.

Megan started tickle fights by poking and tickling Glenn and would have a hard time stopping when he told her to. The night before Megan talked to the bus driver, she had tried to get Glenn into a tickle fight; he did not want to participate, she jumped on his back to get him to play and he "picked Megan off his back and placed her on the couch." Megan was laughing the whole time.

Appellant said that Glenn's relationship with her children was "kind of difficult" the first few years and it took some time for them to "work together." At one point Matt and Glenn butted heads because Matt was rebelling against Glenn; Matt grew out of this and the two became "pretty good friends," and then "it was Megan's turn to rebel." Megan gave appellant problems too, especially in trying to avoid doing chores. Megan "always liked Glenn" and he always thought of her as his daughter; they watched TV together and he took her to father/daughter dances at her request. Appellant said Glenn "always respected the kid's privacy" and knocked before entering any room, and appellant did not recall him ever walking in on Megan. The door to the bathroom in appellant and Glenn's bedroom was broken and when Megan took a shower there, she always locked the bedroom door. Megan would walk around the house in "short shorts

17

and spaghetti strap tight tank tops"; Glenn was always telling her to " 'put some clothes on' " and appellant agreed but "getting a pre-teen to wear what they don't want is not an easy task."

Appellant had never observed, and no one had ever told her about, "any inappropriate touching by anyone." Glenn called appellant names during arguments, which she attributed to his "speaking out of anger," and used words like " 'Bitch' or states to 'F-off'," but this never bothered appellant.

The court took judicial notice of the 2004 verdict in a criminal case in which Glenn was acquitted on charges of domestic violence against his ex-wife, and of the statement of decision in the dissolution of Glenn's marriage to his ex-wife, in which the court ordered Glenn to participate in a 52-week anger management course and found that although Glenn had been acquitted on the domestic violence charges, he was "verbally, emotionally, and on occasion physically abusive" toward his ex-wife.

At the conclusion of the evidence, petitioner argued that Megan's descriptions of tickling incidents in which Glenn got his finger stuck in her clothing were sufficient to establish sexual abuse under section 300, subdivision (d), that the inconsistencies in Megan's descriptions of the shower incident did not affect the essence of her report, and that her recantation was not credible. Matthew's attorney waived argument; Christopher's attorney and Megan's attorney supported the Bureau's position. Appellant's attorney urged that Megan was lying about the claimed abuse.[8]

---

[8] In response to questions from the court, Megan's attorney initially acknowledged that the tickling incidents occurred. The court expressed difficulty accepting that Megan was lying about everything except the tickling because "she was speaking in the same breath, with the same affect, and with the same dictions and same body language" with respect to the shower incident and the tickling. The court noted that while appellant and Matthew both described tickling fights between Megan and Glenn, only Megan testified that there were tickling incidents no one else saw: "I think we're talking about two different kinds of tickling. The kind she was describing, the kind that she felt had an improper purpose, which she was then recanting in one time and saying it was not for an improper purpose, that's a different tickling to the kind of tickling that I think Matthew and maybe [appellant] observed." Appellant's attorney clarified that she did not think

18

On December 14, the court explained that it had to "make a decision as to the credibility of all of the participants" because of the "complete disagreement" between the Bureau and all parties other than appellant urging that appellant failed to protect Megan from Glenn molesting her, and appellant urging that Megan made up the entire story because of her disagreements with and ill feelings toward Glenn. The court noted that it could not evaluate Glenn's testimony and demeanor because neither side called him as a witness.[9]

The court concluded, "based on the totality of the circumstances," that it was not possible to reject Megan's testimony. Expressly recognizing that there were "inconsistencies, if not outright lies at times," the court has concluded that "in general the specificity and persistence with which these allegations were made, as well as her demeanor here in the courtroom under oath, are sufficient for the court to conclude that Children and Family Services have borne their burden of proof with respect to Megan." The court did not believe Megan's story at her first interview that the shower incident was a dream, finding it "not seem credible" that Megan "would have such a dream and account it with such detail while accounting with the same level of detail the other incidents which are described as tickling incidents." The court saw the first interview as demonstrating that Megan had realized the consequences of her report and was "grappling with how to get out from those allegations having been made so as to either be returned to her mother where she wanted to be or just to have the whole problem go away." The court stated, "It just defies my experience and my imagination that someone of such tender years will have the skill level necessary to concoct that kind of story," and that Megan did not appear to be that manipulative or capable of "such evildoing." The court saw Megan as "capable of misunderstanding situations" and "capable of reacting in a teenage manner to things that she didn't approve of that [Glenn] did in his form of

there were distinct types of tickling incidents and that Megan was fabricating anything about fingers getting caught in her clothing.

[9] The court had previously questioned appellant's attorney as to why Glenn had not testified, indicating it would have liked to hear Glenn deny the allegations.

discipline of her," and found this insufficient to allow the court to reject her testimony entirely.

The court believed it was more likely that "there was some incident in the shower between her and [Glenn], that that incident was traumatic and shocking to her, and that she did not deal with it in an adult manner, and she should have done so but did not, and that she is acting in a way that's not unusual for victims of these types of events to react to, which is they do not report the incidents at the first available opportunity and when they do they either minimize them or they describe them in a way that is insufficient for people to take the appropriate corrective action." The court declined to find that Megan actually informed appellant about the shower incident a year and a half before because it was not clear from the record that she reported it this long before.

The court found that the "tickling incidents" were an independent basis for sustaining the allegations "because this tickling of a child by a stepfather, even if it occurred above the clothing, would be inappropriate. But it didn't stop there. According to Megan the tickling went below clothing and fingers got stuck at inappropriate times." However, the court found that appellant was not necessarily aware of this conduct and Megan did not claim to have told appellant about it.

The court sustained the petition as to Megan but amended the language of the allegations under section 300, subdivision (d), to state that "there was inappropriate sexual contact between" Glenn and Megan (allegation d-1). The court did not sustain the allegations that Glenn touched Megan's vagina and breasts and tried to get her to touch his penis, finding Megan's testimony on these specifics insufficient.[10] The court also did not sustain the allegations concerning sexual touching by Matthew.

The court sustained the petition as to Matthew with the same amendment, deleting the specific factual allegations that Glenn touched Megan's vagina and breasts and tried

---

[10] The court made a point of noting, however, that its decision not to sustain the specific factual allegations did not necessarily mean the incident did not happen, as it would not be unusual for a minor to be so traumatized by such as event as to not "have the recall" for it.

20

to get her to touch his penis, so that the petition referred only to Megan having been "sexually molested" by Glenn (allegation j-1). The court also did not sustain the allegation under section 300, subdivision (j), referring to appellant having been told that Glenn touched Megan inappropriately (allegation j-2).

In its report for disposition, the Bureau recommended that Megan's dependency be vacated, the petition dismissed, and Christopher granted sole physical and legal custody, with supervised visitation for appellant and no contact with Glenn. The Bureau recommended that Matthew be adjudged a dependent, with out-of-home placement, reunification services for both parents, visitation with Christopher, supervised visitation with appellant, and no contact with Glenn. Megan was living with Christopher and Matthew was living in a foster home. Appellant had told the social worker that she loved the children, wanted Matthew returned to her care and wanted Megan to remain with Christopher. Both children had said they did not want to return to appellant's care because appellant continued to live with Glenn. Christopher had said he loved both children and would like to have both in his care, but understood that it was best for the children to live separately at this time. Megan had been angry, hurt and depressed since learning that appellant wanted Matthew returned to her but not Megan. Appellant told the social worker that she did not believe Glenn sexually abused Megan and that he had at times been a strong disciplinarian. The Bureau did not believe the children could be safely returned to appellant's custody because of the children's disclosures.

At the disposition hearing on February 1, 2012, appellant testified that she still lived with Glenn because she had nowhere else to go, that she did not think Glenn had treated her children inappropriately and that Glenn had never physically abused her but "might have called me a couple names every now and again." She testified that she would move out of Glenn's home if she could and thought it would be best for her children if she did so. She had not talked to Glenn about wanting to leave him.

Adopting the Bureau's recommendations, the court found clear and convincing evidence that the children's welfare required removing them from appellant's custody (§ 361, subd. (c)(1), (4)). The court vacated Megan's dependency and awarded sole legal

and physical custody to Christopher, with appellant to have supervised visitation for one hour, once a month and no contact between Megan and Glenn. As to Matthew, the court ordered reunification services for appellant and Christopher, with visitation to be arranged by the Bureau, and no contact between Matthew and Glenn.

Appellant filed timely notices of appeal on March 15, 2012.

## DISCUSSION

### I.

Appellant argues that the sustained petitions fail to state a cause of action as to either of the children because the petitions do not contain a precise statement of facts. She further argues that there was insufficient evidence to support the jurisdictional findings.

"A dependency petition must contain a 'concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted.' (§ 332, subd. (f).) If the parent believes that the allegations, as drafted, do not support a finding that the child comes within section 300, the parent has the right to bring a motion akin to a demurrer. (*In re S. O.* (2002) 103 Cal.App.4th 453, 460.)

"When the facial sufficiency of a petition filed under section 300, subdivision (b) is challenged on review, we construe the well-pleaded facts in favor of the petition to determine whether the Agency pleaded that the parent or guardian did not supervise or protect the children within the meaning of section 300, subdivision (b). (*In re Janet T.* (2001) 93 Cal.App.4th 377, 386; *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1133.) A facially sufficient petition 'does not require the pleader to regurgitate the contents of the social worker's report into a petition, it merely requires the pleading of essential facts establishing at least one ground of juvenile court jurisdiction.' (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 399–400.)" (*In re Kaylee H.* (2012) 205 Cal.App.4th 92, 107–108.)

"The purpose of the petition is to give a parent adequate notice of the allegations against him or her." (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83.) "Notice of

the specific facts upon which removal of a child from parental custody is predicated is fundamental to due process" and "necessary to enable the parties to properly meet the charges." (*In re Jeremy C.* (1980) 109 Cal.App.3d 384, 397; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1036–1037.)

A number of cases have held that " ' "[i]f the jurisdictional findings are supported by substantial evidence, the adequacy of the petition is irrelevant." [Citation.]' ([*In re*] N.*M.* [(2011) 197 Cal.App.4th 159,] 166, fn. omitted.) 'The only exception occurs when a parent claims a petition fails to provide actual notice of the factual allegations. Unless the alleged factual deficiencies result in a miscarriage of justice, the reversal of a jurisdictional order supported by substantial evidence is unwarranted.' (*In re Javier G.* (2006) 137 Cal.App.4th 453, 458–459.)" (*In re John M.* (2012) 212 Cal.App.4th 1117, 1123; *In re Athena P.* (2002) 103 Cal.App.4th 617, 626–627.) "[A]fter a hearing on the merits has been held on the petition, the focus must necessarily be on the substance of the allegations found true by the juvenile court, not idiosyncratic particulars of the social worker's precise language. Anything less would allow parents to hold linguistic deficiencies in the petition as a kind of trump card by which they could attack a finding that a child fell within one of the descriptions of section 300, even though that finding was supported by substantial, indeed overwhelming evidence." (*In re Jessica C., supra,* 93 Cal.App.4th at pp. 1037–1038.)

Appellant urges us not to follow this rule because *Athena P.*, *supra,* 103 Cal.App.4th 617, the case respondent offers in support of the rule, "is the only case that has held so" and "seemed to conflate waiver with sufficiency of the evidence issues." Instead, appellant asks us to follow cases which have held that an inadequate petition requires reversal regardless of the sufficiency of the evidence. (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 396–400; *In re Nicholas B., supra,* 88 Cal.App.4th at pp. 1132–1137.)

As can be seen above, *Athena P.* is not the only case to hold that an inadequate petition does not require reversal where, after a hearing on the merits, substantial evidence supports jurisdiction. *Alysha S.* did not discuss the sufficiency of the evidence;

its holding was that a facially sufficient petition is a prerequisite to the juvenile court assuming jurisdiction. (51 Cal.App.4th at p. 399.) *Nicholas B.* followed *Alysha S.* on this point. (88 Cal.App.4th at pp. 1136–1137.) In our view, *Athena P.* states the better view: If sufficient notice was provided to the parent and substantial evidence supports jurisdiction, deficiencies in the allegations of a petition are harmless error. (*In re Athena P., supra,* 103 Cal.App.4th at pp. 627–628.) The result of the contrary rule would be to prolong juvenile dependency proceedings, even in cases where substantial evidence supports jurisdiction under section 300, contrary to "the emphasis on expeditious processing of these cases so that children can achieve permanence and stability without unnecessary delay if reunification efforts fail." (*In re David H.* (2008) 165 Cal.App.4th 1626, 1640.)[11]

In any event, appellant's challenges to the sufficiency of the petitions are unavailing. With respect to section 300, subdivision (b), as sustained, the petitions alleged that the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness . . . as a result of the failure or inability of his or her

---

[11] *David H.* referred to this emphasis on expeditious processing of dependency cases in explaining why it rejected the position taken by *Alysha S.* that a challenge to the sufficiency of a petition may be raised for the first time on appeal. (165 Cal.App.4th at p. 1640.) *Alysha S.* has been criticized on this point repeatedly, by courts holding instead that a challenge to the sufficiency of a petition is forfeited if not raised in the juvenile court. (*In re Christopher C., supra,* 182 Cal.App.4th 73, 84–85; *In re David H., supra,* 165 Cal.App.4th 1626, 1637; *In re James C.* (2002) 104 Cal.App.4th 470, 480; *In re Athena P., supra,* 103 Cal.App.4th at pp. 627–628; *In re S. O., supra,* 103 Cal.App.4th 453, 459; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 328.)

The forfeiture issue has not been raised in the present case, as appellant demurred to the amended petitions. The Bureau opposed the demurrer and the court overruled it. The demurrer was directed to a different petition than the one actual sustained, since the juvenile court amended the petitions at the end of the hearing after declining to sustain certain of the specific factual allegations. While appellant did not specifically argue below that the allegations the court sustained were insufficient to support jurisdiction— the claim she presses on appeal—her arguments in the demurrer that the allegations were uncertain and ambiguous were directed at the more general language that remained in the petition, not the particular factual allegations the court found were not supported.

parent or legal guardian to supervise or protect the child adequately" in that "[t]he child's mother has failed to protect the child from the mother's live-in boyfriend [Glenn] who has physically and emotionally abused the child on an ongoing basis for at least three years." Appellant contends this allegation was insufficient to state a cause of action because it merely states a conclusion, rather than facts that would give notice of the allegations against her, and fails to allege facts suggesting either child has or is likely to suffer serious physical harm.

These arguments are not persuasive. With respect to notice, the petition made clear that the basis of jurisdiction was appellant's failure to protect the children from ongoing abuse by Glenn over the course of at least three years. The social worker's reports, and the children's testimony at the jurisdictional hearing provided specifics. (See *In re John M., supra,* 212 Cal.App.4th at pp. 1123–1124 [petition amended at "fairly late stage in the proceedings" and "by the time of the hearing the petition was accompanied by several DCFS reports," so mother could not argue prejudicially inadequate notice of allegations against her].) The social worker's summary of Officer Gillespie's police report related Megan's friend saying that Megan complained that Glenn spanked her and hit her; Matthew's therapist told the social worker that the children had spent the entire summer with their grandmother because Glenn had threatened Matthew; at her second interview, Megan said that Glenn would hit her and Matthew with his hands, a board or a belt, sometimes leaving red marks that lasted about a week, and that appellant was aware of this. Megan testified that Glenn spanked her with a belt, a hand, or a polished wooden board, and shoved Matthew against the wall. Matthew described Glenn's past physical abuse, including spanking him, pushing him and on one occasion grabbing his neck and slapping him, and ongoing verbal abuse; he described an incident when he heard what he thought was Glenn hitting appellant, although he did not actually see this, saw Glenn grab and push appellant in an incident where she was trying to protect Matthew when Glenn was mad at him, and testified that he was concerned about the safety of his mother and sister, and sometimes himself, around Glenn. That appellant had notice of the specific

25

facts underlying the allegations is demonstrated by the declaration she filed responding to them.

The petitions also sufficiently alleged facts suggesting a risk of serious physical harm to the children. "[B]efore courts may exercise jurisdiction under section 300, subdivision (b) there must be evidence 'indicating the child is exposed to a substantial risk of serious physical harm or illness.' " (*In re Janet T.* (2001) 93 Cal.App.4th 377, 387–388, quoting *In re Rocco M.* (1991) 1 Cal.App.4th 814, 823.) "[E]vidence of past events may have some probative value in considering current conditions . . . if circumstances existing *at the time of the hearing* make it likely the children will suffer the same type of 'serious physical harm or illness' in the future." (*In re Janet T., supra,* 93 Cal.App.4th at p. 388.) " '[A] court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian, which indicate the child is at risk of serious physical harm. . . .' " (*Ibid.*, quoting § 300, subd. (a).)

*In re Janet T., supra,* 93 Cal.App.4th 377, 391, upon which appellant relies, found the factual allegations of a petition insufficient to support jurisdiction under section 300, subdivision (b). The allegation that the mother's failure to ensure the children attended school was deficient because no facts were alleged to demonstrate that the failure to attend school, although seriously detrimental in other ways, "created a 'substantial risk' of suffering '*serious physical harm or illness*.' " (*Janet T.*, at pp. 388–389.) The allegation that the mother had demonstrated mental and emotional problems was deficient because no facts were alleged to suggest how these problems created the requisite risk, and none of the facts described in the social workers' reports concerned conditions existing at the time of the hearing, events resulting from or caused by the mother's mental and emotional problems, or a current risk of serious physical harm due to those problems. (*Id.* at pp. 389–390.) Here, by contrast, the petition alleged appellant's *current* failure to protect the children from *on-going* physical abuse, and the facts brought forth in the reports and testimony made clear that the past incidents were

26

likely to recur because appellant continued to live with Glenn and did not believe he posed any risk to the children.

Nor is the present case like *In re Nicholas B., supra,* 88 Cal.App.4th 1126. That case involved a minor who presented extreme behavioral challenges. One factual allegation based jurisdiction on a single past incident in which the mother inflicted an injury upon the child, but no facts were alleged to suggest a risk of such an incident being repeated. (*Id.* at pp. 1133–1135.) Other factual allegations stated that six months of voluntary services had not resulted in reunification and the child continued to engage in behaviors the parents objected to; the *Nicholas B.* court found these allegations had a "tenuous connection to the failure to protect arising out of past infliction of physical harm." (*Id.* at p. 1135.) Another allegation, that the child had been diagnosed with a conduct disorder, failed to set forth any facts indicating the parents were responsible for the child's emotional problems. (*Id.* at pp. 1133, 1136.) Finally, while there was a great deal of testimony about the "physically intimidating, even abusive personality of the father and his physical acts against the minor," the father was not mentioned in any of the petition's factual allegations. (*Id.* at p. 1135.) The present case involves neither a single past incident of abuse nor a perpetrator of abuse not mentioned in the petition.

Appellant also argues that section 300, subdivision (b), does not provide for jurisdiction based on "emotional harm." This much is true: Emotional harm in and of itself, absent serious physical harm or a risk of serious physical harm, is not a basis of jurisdiction under subdivision (b). (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 718.)[12]

---

[12] Respondent attempts to validate emotional harm as a basis for jurisdiction under section 300, subdivision (b) by reference to two cases finding that domestic violence in the household where children are living amounts to a failure to protect under subdivision (b), *In re Heather A.* (1996) 52 Cal.App.4th 183 and *In re Sylvia R.* (1997) 55 Cal.App.4th 559. These cases do not support respondent's position. *In re Heather A.* established jurisdiction under subdivision (b) based on allegations that the minors were "periodically exposed to violent confrontations between Father and [stepmother] which endanger their physical and emotional safety." (52 Cal.App.4th at p. 194.) The case focused on risk of *physical* harm: Finding substantial evidence of continuing violence between the father and stepmother, the court stated, "Obviously the children were put in a

Jurisdiction based on emotional harm is the subject of subdivision (c), which "requires the court to find that the child is suffering or at the risk of suffering 'serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others . . . .' (§ 300, subd. (c).)" (*In re Daisy H., supra,* 192 Cal.App.4th at p. 717.) Subdivision (c) was not alleged as a basis of jurisdiction here.

But appellant's argument misses the mark because the petition did not purport to establish jurisdiction on the basis of emotional harm. Rather, the allegations under section 300, subdivision (b) refer to emotional abuse in alleging that appellant's failure to protect the children from Glenn's ongoing physical and emotional abuse created a substantial risk that they would suffer serious physical harm. In other words, emotional abuse is referred to in the petition as part of the background creating the alleged risk of serious physical harm, not as a basis for jurisdiction in its own right.

The evidence supported the court's finding of jurisdiction under section 300, subdivision (b). As described above, Megan's friend told the police that Megan complained that Glenn spanked her and hit her; Megan said that Glenn would hit her and Matthew with his hands, a board or a belt, sometimes leaving red marks that lasted about a week, and that Glenn shoved Matthew against a wall; Matthew's therapist reported that the children had spent the summer with their grandmother because Glenn had threatened

---

position of physical danger from this violence, since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg, or by [the stepmother] falling against them. . . . [D]omestic violence in the same household where children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." (*Ibid*.) *In re Sylvia R.* reaffirmed that " 'spousal abuse is detrimental to children' " in terms of both physical and emotional harm. (55 Cal.App.4th at p. 562.) The case was not concerned with jurisdictional findings: Its discussion of spousal abuse came in the context of rejecting a father's argument that he was entitled to a hearing on whether orders terminating reunification services should be terminated because a spousal abuse charge that had been pending when the termination order was made had since been dismissed. (*Id.* at pp. 561–563.)

Matthew. Matthew described Glenn having spanked him, pushed him and on one occasion grabbed his neck and slapped him. Even without consideration of the evidence suggesting—albeit not necessarily proving—that Glenn was physically abusive toward appellant, the above described evidence was sufficient to establish that Glenn had been physically abusive toward the children in the past. Combined with the ample evidence of Glenn's temper and ongoing verbal abuse, and appellant's refusal to acknowledge any problem requiring intervention, the evidence supported the court's conclusion that the children were at risk of suffering serious physical injury due to appellant's failure to protect them.

Under section 300, subdivision (d), the sustained petition concerning Megan alleged, "The child has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by his or her parent or guardian or a member of the child's household" in that "[t]he child has been sexually molested in her mother's home by the mother's live-in boyfriend [Glenn] on at least three occasions over a two year period" (allegation d-1) and "The child's mother has failed to protect the child from ongoing sexual abuse by the mother's live-in boyfriend [Glenn] in that despite being told by the child that [Glenn] had touched her inappropriately, the mother did not believe the child and failed to take any action to prevent further instances of sexual abuse" (allegation d-2).

Appellant urges that these allegations fail to state a cause of action because they do not allege any specific act of molestation. We find it unnecessary to resolve whether a petition containing the allegations at issue here would be sufficient to withstand a challenge raised before trial. As we have said, after trial, if sufficient notice was provided to the parent and substantial evidence supports jurisdiction, deficiencies in the allegations of a petition are harmless error. (*In re John M., supra,* 212 Cal.App.4th at p. 1123; *In re Athena P., supra,* 103 Cal.App.4th at pp. 627–628.) Here, the allegations of the amended petition, filed on June 17, 2011, included specific sexual acts. Due to inconsistencies between Megan's accounts, the trial court did not sustain these specific allegations. Nevertheless, it concluded that there was "some incident in the shower

29

between her and [Glenn]" that was "traumatic" and "shocking" to Megan. Moreover, the court found that the tickling episodes Megan described were an independent basis for sustaining the allegations of sexual molestation, making clear that it believed Megan's description of incidents in which Glenn's tickling "went below clothing and fingers got stuck at inappropriate times" despite appellant's characterization of the tickling episodes as innocent. The court specifically rejected Megan's statements at her first interview that Glenn did not have any inappropriate intent in these incidents, and found to the contrary. Although not specifically included in the allegations of the amended petition, appellant had notice of the tickling incidents as an additional basis of the section 300, subdivision (d) allegations and addressed them in her declaration. Substantial evidence supports the trial court's conclusion that these incidents constituted sexual abuse within the meaning of section 300, subdivision (d),[13] and appellant does not argue otherwise on this appeal.

Finally, appellant contends that Matthew's petition failed to state a cause of action under section 300, subdivision (j) because, as in appellant's challenge to the section 300, subdivision (d) allegations discussed above, no specific acts of molestation were alleged, and no specific facts were alleged to explain how *Matthew* was at risk of abuse due to *Megan* having been molested. The sustained petition alleged under subdivision (j) of section 300, that "[t]he child's sibling has been abused or neglected . . . and there is a

_____

[13] Section 300, subdivision (d), defines "sexual abuse" by reference to Penal Code section 11165.1. That statute, in turn, defines " 'sexual abuse' " as including conduct violating enumerated statutes, the two relevant here being Penal Code section 288, subdivisions (a), (b), or (c)(1) (lewd or lascivious acts upon a child) and Penal Code section 647.6 (child molestation). Penal Code section 11165.1 further provides that "sexual abuse" includes, but is not limited to, "intentional touching of the genitals or intimate parts (including the breasts, genital area, groin, inner thighs, and buttocks) or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification, except that, it does not include acts which may reasonably be construed to be normal caretaker responsibilities; interactions with, or demonstrations of affection for, the child; or acts performed for a valid medical purpose." (Pen. Code, § 11165.1, subd. (b)(4).)

substantial risk that the child will be abused or neglected . . ." in that "[t]he child is at risk in his mother's care in that the child's sibling has been sexually molested in her mother's home by the mother's live-in boyfriend [Glenn]."

Depending on the surrounding circumstances, sexual abuse of a female child may support jurisdiction over her male sibling under section 300, subdivision (j). (*In re I.J.* (2013) 56 Cal.4th 766, 780.) In some cases, the risk to the male sibling may be of sexual abuse; in others, it may be risk of a different harm contemplated by the statute. " 'Subdivision (j) does not state that its application is limited to the risk that the child will be abused or neglected *as defined in the same subdivision* that describes the abuse or neglect of the sibling. Rather, subdivision (j) directs the trial court to consider whether there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) *or* (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling.' " (*In re I.J., supra,* 56 Cal.4th at p. 774, quoting *In re Maria R.* (2010) 185 Cal.App.4th 48, 64.)

In any event, it is not necessary for us to determine whether jurisdiction would have been supported under section 300, subdivision (j). As we have said, substantial evidence supported the juvenile court's finding that Matthew came within the court's jurisdiction under subdivision (b) of section 300. Jurisdiction under section 300 may be based on any single subdivision. (*In re Christopher C., supra,* 182 Cal.App.4th at p. 83; *In re Shelley J., supra,* 68 Cal.App.4th at p. 330.)

## II.

Appellant next contends that the trial court abused its discretion and violated her constitutional right to due process by unduly restricting her cross-examination of Megan. At the jurisdiction hearing on September 14, after Megan's direct testimony, 25 pages of the reporter's transcript in length, and 12 transcript pages of cross-examination, the court noted that Megan had been testifying for about an hour and asked if she wanted a break, which she did. After the break and a discussion between the court and counsel on matters unrelated to Megan's testimony, with 15 minutes remaining in the court day, the court told appellant's attorney it wanted the cross-examination finished because Megan had

31

been on the witness stand for more than an hour and the court felt they were "at the point of seriously diminishing returns." Appellant objected that she would be deprived of due process if the court cut off her opportunity to point out "all the inconsistent statements." Explaining that its purpose was to spare Megan "further trauma" that was "not in the interest of reunification," the court suggested that counsel make a "general offer about the other inconsistencies, because there probably isn't a dispute about who she said what to at what point in time." Counsel for the Bureau noted that the inconsistencies were all in the reports, and the court told appellant's attorney she was free to use the rest of the day to ask Megan about "some really specific sizzler" but "I just think she's already told you she lied at the first interview, and she told you why, and she's not being consistent about the pajamas or whether she was actually showering or about to shower or all of those little details. So I just don't want us to spend a whole hour of [a 12-year old] being cross-examined." The court made clear it did not want the "specter of more cross-examination hanging over [Megan's] head" until the next hearing date.

Appellant's attorney asked the court if the proceedings were going to go beyond 4:30 p.m., and the court responded, "Not much, maybe five minutes, because we're not allowed to—P.J. decree." Counsel said she might not be able to finish in that amount of time and the court told her it would not give more. She proceeded to cross-examine Megan, as reflected in an additional 13 pages of reporter's transcript, until the end of the court day. Commenting that it did not expect there to be much more testimony, if any, from Megan, the court told counsel, "[i]f there is I want an offer of proof as to what it is specifically so that we can see whether it's contested." Appellant's attorney said she would compile an offer of proof regarding Megan's testimony; the court confirmed that this was not required for other parts of the trial. The court stated that it would have Megan return to court if, after the next hearing, counsel persuaded the court that there was "more stuff that Megan has to answer for." When counsel objected that she could not be required to proceed by offer of proof in a jurisdictional trial, the court said it agreed, but stated, "But I can sustain [Evidence Code section] 352 and did sustain objections, so your examination would be at an end." Counsel explained that she did not

object to the offer of proof requirement as to Megan's inconsistent statements but did object to having to provide her entire case by offer of proof because "regarding a lot of other areas I want to go into I don't want to notice everybody what I'm doing and where I'm going before the witness testifies." The court reiterated that it had ruled under Evidence Code section 352 that "whatever probative value of questions was over as far as Megan was concerned" but that it was open to being persuaded by offer of proof or otherwise that there was sufficient reason to have Megan testify again.

On October 28, appellant's attorney filed a document entitled "Evidence of Further Cross-Examination of Megan [G.]," presenting in chart form five versions of Megan's descriptions of the shower incident and the touching by Matthew (referring to her reports to O'Donnell, to Detective Hart, in the Detention/Jurisdiction Report, at the April interview and at the August interview). At the hearing on this date, with the next hearing date set more than a month away, the court directed appellant's attorney to fax to all parties and the court two days before the next hearing a list of the witnesses she intended to call, with short summaries of the expected testimony, so the court could "start to cut the proceedings short" because it had "a feeling that what is mentioned there is probably not really in dispute."[14] When the hearing resumed on December 7, petitioner requested sanctions because appellant's attorney had not complied with the court's order. Appellant's attorney stated she had no recollection of the order and the parties ultimately reached agreements that avoided the need for further live testimony. Appellant's attorney later returned to the matter of Megan's cross-examination, saying that there were "a lot" of questions she had for Megan. The court indicated that the question of Megan's testimony remained to be resolved after disposing of other issues, but no further discussion of it appears in the record.

Appellant contends that the trial court violated her due process rights by limiting her cross-examination of Megan, the key witness in the case with respect to the sexual abuse allegations. Emphasizing the importance of cross-examination in evaluating a

---

[14] The other parties did not expect to call witnesses.

33

witness's credibility, knowledge and recollection, and in fully developing the facts, she argues that the trial court erred in requiring an offer of proof before it would permit continued cross-examination.

A four-part test is used under California and federal law to determine "what sort of process is due in a given judicial or administrative proceeding. 'This flexible balancing standard considers " '(1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the [dignity] interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " ' " (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1246, quoting *In re Malinda S.* (1990) 51 Cal.3d 368, 383.)

Appellant relies on a series of cases establishing a parent's right to a contested dependency hearing. In *In re Matthew P.* (1999) 71 Cal.App.4th 841, de facto parents filed a petition for modification (§ 388) seeking to regain custody of children who had been removed from their care and sought to cross-examine the social worker who prepared the report. (*Id.* at p. 847.) The juvenile court refused to allow cross-examination under a rule of court giving the court discretion to hear section 388 motions on documentary evidence, without testimony. (*Id.* at pp. 847, 850.) *In re Matthew P.* reversed the denial of the modification petition, finding that by relying solely on the social workers' reports, the court denied the de facto parents the opportunity to be heard that is fundamental to due process. (*Id.* at p. 851.) *In re James Q.* (2000) 81 Cal.App.4th 255 involved a juvenile court's denial of a parent's request for a contested dependency review hearing on the basis that there had not been a sufficient offer of proof regarding evidence to be presented at such a hearing. Based upon consideration of the four factors described above, *In re James Q.* held, "[a]s a matter of statutory construction and constitutional due process, we conclude the juvenile court cannot require a party to a

34

review hearing to tender an offer of proof as a condition to obtaining a contested hearing. ([Citations.]) A party must be able to make its best case, untrammeled by evidentiary obstacles arbitrarily imposed by the courts without legislative sanction. (Cf. *In re Heather P*. [(1989)] 209 Cal.App.3d [886,] 891.)" (81 Cal.App.4th at p. 266.) *David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 779, agreeing with *In re James Q.*, further stated, "At review hearings, the agency bears the burden of proof. It would be anomalous indeed to require the opponent of proffered evidence to make an offer of proof as to anticipated weakness or errors in their adversary's evidence."

In a case where the parent bears the burden of proof, requiring an offer of proof may be appropriate. Upholding the juvenile court's denial of a parent's request for a contested section 366.26 hearing at which she could attempt to demonstrate the existence of one of the exceptions to termination of parental rights, *In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122, held that because "due process does not permit a parent to introduce irrelevant evidence, due process does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest." Accordingly, "a trial court does not deny due process if it requires a parent to make an offer of proof before it conducts a contested hearing on the issue of whether a parent can discharge his or her burden of establishing a statutory exception to termination of parental rights." (*Id.* at p. 1116.)

Where the social services department has the burden of proof, however, "[p]recluding the parents from exploring and testing the sufficiency of the Department's evidence is fundamentally different than requiring them to describe evidence they will offer to prove a point. . . . It is one thing to require a parent to show he or she has relevant evidence to proffer on an issue on which he or she bears the burden of proof before scheduling a contested evidentiary hearing on that issue. It is quite another to deprive him or her of the opportunity to explore the strength of the agency's evidence that the child is likely to be adopted." (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 732.)

Nevertheless, we cannot accept appellant's characterization that this is what the juvenile court did here. The court in the present case did not deny appellant a hearing or completely prevent her from cross-examining Megan. Rather, after a period of cross-examination, the court informed appellant that it would permit further questioning of this young witness only if appellant could convince the court there were relevant areas of questioning that had not already been pursued. The court made clear that it was aware of the many inconsistencies between Megan's various descriptions of the alleged abuse and aware that Megan had lied in some of those reports, and that it wanted to spare Megan the trauma of further cross-examination if that cross-examination was not going to produce evidence relevant to the court's decision.

The cases upon which appellant relies, which involved complete deprivation of a parent's right to cross-examination and to present evidence, noted that juvenile courts have the authority to impose limitations on the proceedings. " '[T]he Evidence Code, among other statutory provisions, provides ample means for the courts to control contested proceedings in the dependency courts. [Citations.]' (*In re James Q., supra*, 81 Cal.App.4th at p. 266.) Objections based on relevancy, undue time consumption, or any of the usual evidentiary objections contained in the Evidence Code are available to the parties." (*David B. v. Superior Court, supra,* 140 Cal.App.4th 772, 779.) This is the authority the juvenile court exercised in the present case under Evidence Code section 352. It did not prevent appellant from cross-examining Megan. It prevented her from continuing the cross-examination beyond the point that the court felt appropriate in light of the matters at issue and the areas of questioning being pursued, absent appellant articulating the basis of a need for further questioning.

*In re Amy M.* (1991) 232 Cal.App.3d 849, upon which appellant relies to emphasize the importance of her right to cross-examine Megan, also concerned a very different situation. There, dependency petitions alleged that one child had been sexually abused by her father, not protected by her mother, and suffered emotional harm, and that her younger brother, Michael, had suffered emotional harm. (*Id.* at pp. 860, 865.) The juvenile court refused to allow the parents to call Michael as a witness based upon

testimony the court-appointed evaluator's opinion that testifying would be stressful for the child and cause him to suffer further emotional harm. (*Id.* at p. 864.) The court ruled that the damage to the child outweighed what he "could do or could say" in testifying. (*Ibid.*) *In re Amy M.* found the parents' due process rights were violated by this ruling because the parents' expert disagreed with the court evaluator as to the cause of Michael's psychological distress, Michael's testimony could have had bearing on the court's evaluation of the competing expert opinions, there was no substitute for his testimony (such as prior testimony or reports containing his statements) and there was no evidence that testifying would be so traumatic as to permit a finding that he was an unavailable witness under Evidence Code section 240.[15] (*Id.* at pp. 865–866.)

As with the other cases upon which appellant relies, the due process violation in *In re Amy M., supra,* 232 Cal.App.3d 849, resulted from an order completely depriving the parents of an opportunity to evidence that could be critical to the jurisdictional determination. Here, as we have said, there was no such deprivation. Megan's statements were contained in the reports, the court saw the videotapes of her interviews, she testified at the hearing and she was cross-examined. The restriction imposed by the juvenile court simply was not analogous to that imposed in *In re Amy M.*

As explained in *In re Thomas R.*, " '[w]hile a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence [citation], parents in dependency proceedings "are not entitled to full confrontation and cross-examination." [Citation.] Due process requires a balance. [Citation.] The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will "necessitate undue consumption of time." (Evid. Code, § 352.) The due

---

[15] Evidence Code section 240 provides that a declarant may be " 'unavailable as a witness' " where expert testimony establishes "that physical or mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness is physically unable to testify or is unable to testify without suffering substantial trauma. . . ." (Evid. Code, § 240, subds. (a)(3), (c).)

process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.' (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146–1147.)" (*In re Thomas R., supra,* 145 Cal.App.4th at p. 733; see *In re J.F.* (2011) 196 Cal.App.4th 321, 335 [parent's due process right "does not invalidate the court's authority to exclude evidence that is not of significant probative value to the issues before the court"].)

The limitation the court imposed here did not prevent appellant from contesting the Bureau's evidence. As we have said, the court emphasized its awareness of the inconsistencies between Megan's reports and outright lies in some of them. Nor did the limitation on further cross-examination prevent appellant from telling her side of the story: The court understood that appellant did not believe the abuse occurred and that she believed that Megan made up the accusations because she was angry about Glenn's harsh discipline in general and his punishment for her calling later than instructed in particular. The court had abundant opportunity to assess Megan's credibility based on the recorded interviews and her testimony in court.

The orders are affirmed.


_____
Kline, P.J.


We concur:


_____
Lambden, J.


_____
Richman, J.