# IN THE COURT OF APPEALS OF IOWA

No. 16-1919
Filed January 11, 2017

**IN THE INTEREST OF S.P. and K.P.,**
**Minor Children,**

**D.P., Mother,**
     Appellant.

_____

Appeal from the Iowa District Court for Butler County, Peter B. Newell, District Associate Judge.

A mother challenges the juvenile court's finding in its dispositional order that the Iowa Department of Human Services had made reasonable efforts toward reunifying her family. **REVERSED AND REMANDED.**

David A. Kuehner of Eggert, Erb, Mulcahy & Kuehner P.L.L.C., Charles City, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Elizabeth A. Batey of Vickers Law Office, Greene, guardian ad litem for minor children.

Considered by Vogel, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

Teenagers S.P. and K.P. refuse to have contact with their mother, Dawn, who is accused of dealing methamphetamine out of their home. On appeal, Dawn contends the juvenile court erred in finding the Iowa Department of Human Services (DHS) had made reasonable efforts at reunification when no visitation had been scheduled during the five months the children had been removed from her care. Although the social workers encouraged the children to see their mother, the DHS insisted that given their ages, the children could not be forced to attend visitation.

In looking at the record anew,[1] we conclude the DHS failed to maintain reasonable efforts toward reunification by delegating the decision regarding visitation entirely to the children. At the next scheduled review hearing, the juvenile court should scrutinize the discretion exercised by the DHS in establishing or not establishing visitation, which would include securing a recommendation from the children's therapist regarding the feasibility of reinitiating contact with their mother through family counseling.

## I.    Facts and Prior Proceedings

This child-welfare case opened in May 2016 when the Butler County Sheriff arrested Dawn for operating while intoxicated (drugged driving) and found eight grams of methamphetamine in her possession. The State charged Dawn with possession of methamphetamine with intent to deliver, a class "B" felony. The DHS placed Dawn's sixteen-year-old daughter, K.P., and fourteen-year-old

---

[1] We review child-welfare cases de novo. *See In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). We are not bound by the juvenile court's factual findings, but we give them weight, especially when credibility is at issue. *See id.*

son, S.P.,[2] in the care of the mother's cousin and her husband. The children had stayed with these relatives on previous occasions and felt secure in their home.

The May 2016 incident was not the first family upheaval experienced by these children. In the spring of 2011, S.P. and K.P. were adjudicated as children in need of assistance (CINA) after authorities discovered their parents were manufacturing methamphetamine. In 2012, the children lost their father to suicide; the children were present in the home when he took his life, and S.P. found his father's body. To address their grief, the children participated in mental health counseling from August 2013 to May 2014. A second CINA adjudication occurred in September 2013 based on the mother's drug use; that case was closed in May 2014.

At a hearing on August 17, 2016, Dawn stipulated S.P. and K.P. were CINA under Iowa Code section 232.2(6)(*l*) (2015) but urged the juvenile court to establish visitation.[3] Her attorney asked the court to "order that visitation take place. Our concern is that if it's not court ordered, that the children's resistance to have the visitation would prevent them from occurring."[4] The court responded:

> I think that's something that needs to be looked into a little bit more carefully. Again, I think if the children need mental health evaluations, we probably want to talk to their counselors about that and set up something where—I mean, if the counselors are willing to do that and there's kind of a therapeutic setting, I think that we

---

[2] The children both have had birthdays in the intervening months and are now ages seventeen and fifteen.

[3] The children were not personally present at the August 17 hearing despite the presumption set out in Iowa Code section 232.91(3) that it is in the best interests of a child who is fourteen years or older to attend all hearings. The children were represented by guardian ad litem Elizabeth Batey at the hearing, but no record was made concerning the waiver of their presence. Batey did offer as an exhibit a letter S.P. had written to his mother asking her to sign a guardianship for his current caregivers.

[4] The mother's attorney also informed the court that his client had completed a month-long inpatient substance abuse program.

can do that. But I think it's just a general proposition. It's not the best thing to order that visitation occur.

The juvenile court explained that in some child-welfare cases it had ordered visits "even though the children don't want to have visits," but here the court believed it was appropriate to "move slowly" and "see how that progresses." In its August 17 adjudication ruling, the court ordered that any visitation between Dawn and her children be at the discretion of the DHS.

No visitation had been arranged as of October 26, 2016. At a dispositional hearing that day, DHS case manager Julie Sharp testified the Family Safety, Risk, and Permanency (FSRP) worker had been encouraging contact between the children and their mother, but the children "did not wish to have any."[5] In her October 18 report to the court, Sharp relayed the FSRP worker's account that the children said they were "done" with their mother. During FSRP home visits with the children on July 14 and September 1, the worker placed phone calls to Dawn, but the children refused to talk. Dawn reported to the DHS that she and K.P. had contact over Facebook in July, and K.P. "was going to sneak out to meet her." K.P. told the workers her mother was "manipulative"—threatening suicide if K.P. did not meet her and asking K.P. what her deceased father would think about her refusing to have contact with Dawn.

At the October 26 hearing, the mother's attorney engaged in the following exchange with Sharp regarding the inability of the DHS to establish contact between Dawn and her children:

---

[5] The children again were not present at the hearing, despite the presumption under section 232.91(3) that attending would have been in their best interests, and again, no record was made as to the waiver of their presence.

Q. What is the Department's position about contact between the mother and the children? A. The Department has encouraged that contact and we ask them about it every—I ask them about it every time I see them. The FSRP provider continues to ask them about it during their, well, now biweekly status visits.

Q. So what steps has the Department done to establish contact between mother and the children? A. As I said, we encourage that contact and we are supportive of that contact, but the children refuse it.

Q. They are the ones dictating—the children are the ones dictating whether or not contact occurs? A.

At this time, yes.

Sharp said the DHS permanency goal remained reunification with the mother but acknowledged that goal would be difficult to obtain if the children continued to refuse contact: "There is a problem with that, but due to the children's ages we cannot force them to have visitation with their mother." Sharp said the only plan to reestablish contact was to continue to encourage the children to see their mother. Sharp testified the children had started counseling, but the DHS had not received any reports yet because the therapist had only visited with them once. She said family therapy was "something that could be attempted" but no immediate plans had been set to schedule it. Sharp also testified she did not have safety concerns about Dawn being around the children other than substance-abuse issues.

At the close of the October 26 hearing, the mother's attorney made the following argument focused on reasonable efforts:

We do have a problem with contact being at the discretion of DHS. As the evidence shows, my client has not seen her kids since May. This is going on, pretty soon, six months that she's been without contact. The permanency goal in this matter is reunification. If there is not more efforts for visits, phone contact, some sort of communication between my client and her children, it's hard for me to imagine how we can say that DHS is making reasonable efforts toward reunification if they are not even requiring the meetings

between the kids and their mother. These are children and they are still children. They shouldn't be able to make decisions like this in this matter. They don't have authority as children to say they don't want to see their parents. I feel the Court should enter its finding that the DHS has not made reasonable efforts to reunification.

The juvenile court responded that "sometimes forcing visitation is counterproductive" and could do "more damage to a relationship than it does help." The court acknowledged the case workers needed to continue to have the children participate in therapy and encourage them to have visits with their mother but concluded it was "still appropriate to leave the discretion the Department of Human Services." The court set the next review hearing for January 25, 2017.

In its October 26 dispositional order, the court found removal continued to be necessary and "reasonable efforts have been made to prevent or eliminate the need of this removal of the children" from their home.

The mother appeals that dispositional order, seeking a reversal of the court's finding "that reasonable efforts have been made by the Iowa Department of Human Services towards the goal of reunification and denying the mother's request to order visitation with her children." In response, the State requests an opinion affirming the dispositional order of the juvenile court.

## II. Analysis

Before initiating an action to terminate parental rights, the State must make reasonable efforts to provide services to a parent whose children have been removed from her care. Iowa Code § 232.102(7), (10)(a); *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002). The concept of reasonable efforts includes a

visitation agreement designed to facilitate reunification while protecting the children from the harm prompting the removal. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996) (emphasizing "[v]isitation between a parent and child is an important ingredient to the goal of reunification").

In this case, the juvenile court left visitation up to DHS discretion. In turn, the DHS admittedly allowed K.P. and S.P. to dictate whether visitation occurred. Because the children told the FSRP worker they were "done" with their mother, no visitation occurred between the time of the children's removal in mid-May and the dispositional hearing in late October. While continuing to encourage S.P. and K.P. to have contact with Dawn, the DHS did not believe it could force teenagers to attend visitation against their expressed desire.

In her petition on appeal, the mother poses the following rhetorical question: "Is allowing the children to dictate the terms of visitation reasonable?" The State counters with its own question: "How exactly [is] DHS supposed to force these teens, one of whom is nearly an adult, to have contact with their mother against their will . . .?" Neither party cites case law directly addressing such a conundrum.

Our court did address the question whether termination of parental rights was appropriate when a thirteen-year-old girl had been "adamantly against visitation" with her father. *See In re K.M.*, No. 11-1732, 2012 WL 642880, at *2 (Iowa Ct. App. Feb. 29, 2012). In that case, "the parties agreed that any possible visitation should be taken slowly and in a therapeutic setting." *Id.* In addition, the parties, as well as the professionals, supported a plan that allowed K.M. to maintain control over the contact with her father to allow her to build trust that he

was making changes that could provide her with a safe and stable home environment. *Id.* The DHS arranged for supervised phone calls and filtered email communication between K.M. and her father. *Id.* Our court noted we were "highly concerned when a child refuses to participate in visitation with a parent," but we found the State met its burden to show reasonable efforts, in part because the father admitted he could not win back K.M.'s trust. *Id.* at *6.

The instant case is distinct from *In re K.M.* in two ways. First, the DHS took more comprehensive and active steps to facilitate communication and rebuild trust between K.M. and her father. *See id.* at *3 (chronicling K.M.'s participation in individual therapy and remedial services aimed at repairing the relationship with her father). In this case, during more than five months of removal, the service providers did little more than "encourage" the children to have contact with their mother during FSRP visits. At Dawn's request, the FSRP workers twice tried to place phone calls but could not convince the children to participate in the conversation. At the time of the October 26 hearing, the DHS case manager had not made any plans for reinitiating contact in a therapeutic setting because the children had just started counseling.

Second, this case differs from *In re K.M.* because Dawn did not support a plan that allowed her teenaged children to control if and when visitation occurred. Right out of the gate, the mother's attorney urged the juvenile court to order visitation, knowing the children were resistant to contact with Dawn. When the court declined to do so in the August 17 order of adjudication, the mother's attorney asked again at the October 26 hearing. Despite hearing Sharp's testimony that the DHS was leaving the visitation decision exclusively up to the

children, the juvenile court stuck with its belief the DHS was properly exercising its discretion regarding visitation and was making reasonable efforts toward reunification.

Considering Dawn's penchant for exposing her children to the underworld of illegal drugs and the traumatic events the children have weathered, it is neither surprising nor irrational that S.P. and K.P. would be fed up with her behavior and figure it was in their best interests to sever contact with her. But the ultimate supervision of the efforts made to reunify the family must remain with the juvenile court. *See* Iowa Code § 232.99(3) (requiring juvenile court at disposition hearing to "inquire of the parties as to the sufficiency of the services being provided and whether additional services are needed to facilitate the safe return of the child to the child's home" and "[i]f the court determines such services are needed," requiring the court to "order the services to be provided").

The juvenile court may not delegate its judicial function to any third party, including the children adjudicated in need of assistance. *Cf. In re Marriage of Stephens*, 810 N.W.2d 523, 530 n.3 (Iowa Ct. App. 2012) (holding dissolution court may not delegate its judicial power to determine visitation or custody arrangements to the parties or a third party). We find appellate decisions from California persuasive on this point. *See, e.g.*, *In re Korbin Z.*, 207 Cal. Rptr. 3d 525, 530 (Cal. Ct. App. 2016) (holding that when the juvenile court "abdicates its discretion and permits a third party, including the dependent child, to determine whether any visitation will occur, the court impermissibly delegates its authority over visitation and abuses its discretion"); *In re Hunter S.*, 48 Cal. Rptr. 3d 823, 828 (Cal. Ct. App. 2006) ("In no case may a child be allowed to control whether

visitation occurs."); *In re Nicholas B.*, 106 Cal. Rptr. 2d 465, 475 (Cal. Ct. App. 2001) (holding "visitation may not be dictated solely by the child involved although the child's desires may be a dominant factor").

Here, the juvenile court improperly allowed the DHS to give the children veto power over an essential reunification service. The issue before us is not whether teenagers can be forced to attend a scheduled visitation against their will. Instead, the pending question is whether the DHS satisfied the reasonable-efforts requirement when the case manager took no meaningful steps to set up a visitation plan for these children. The children's preferences do not relieve the DHS of its duty to provide reasonable efforts. We conclude the court erred in finding reasonable efforts were satisfied when the DHS impermissibly delegated the visitation decision to the dependent children. To establish reasonable efforts, the DHS must either present a definitive plan with the ultimate goal of visitation or make a showing that visitation is not in the children's best interests.

In addressing the reasonable-efforts question at the review hearing, the court may appropriately rely on an evaluation by the children's therapists regarding the children's emotional conditions and the feasibility of reinitiating contact with their mother through family therapy. The court may also consider requiring the children's attendance at the hearing so that the court can hear their concerns firsthand.[6] The court may consider the children's opposition to contact with their mother in deciding if visitation is in their best interests. *See In re N.B.*, No. 04-1100, 2004 WL 1900007, at *1 (Iowa Ct. App. Aug. 26, 2004) (agreeing it

---

[6] In the context of dissolution cases, Iowa courts have considered the age and educational level when deciding the weight to give the custody preferences of a minor child. *See In re Marriage of Ellerbroek*, 377 N.W.2d 257, 258–59 (Iowa Ct. App. 1985).

was not in the child's best interest that visitation with the father be forced); *see also In re Brittany C.*, 120 Cal. Rptr. 3d 338, 347 (Cal. Ct. App. 2011) (noting "child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation" (citation omitted)).

We reverse the portion of the dispositional order finding the DHS made reasonable efforts toward reunification and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**